United States v. Bahel

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————

August Term, 2010

(Argued: July 8, 2009, and January 13, 2011   Decided: October 26, 2011)

Docket No. 08-3327-cr

———————————

UNITED STATES,

*Appellee*,

-v.-

SANJAYA BAHEL,

*Defendant-Appellant*.[*]

———————————

Before: POOLER and RAGGI, *Circuit Judges*, and KORMAN, *District Judge*.[**]

Appeal from a judgment of conviction entered in the United States District Court for the

Southern District of New York (Griesa, *J.*), convicting Appellant Sanjaya Bahel of four counts of

use of the mail or wires in furtherance of fraud that deprived the United Nations, his former

employer, of its intangible right to his honest services in violation of 18 U.S.C. §§ 1341, 1343,

1346; one count of corrupt receipt of things of value with intent to be rewarded with respect to

official business in violation of 18 U.S.C. § 666; and one count of conspiracy in violation of 18

U.S.C. § 371. We hold that the United Nations expressly waived Bahel's immunity, and even if

———————————

[*] The Clerk of the Court is directed to conform the caption in accordance herewith.

[**] Honorable Edward R. Korman of the United States District Court for the Eastern
District of New York, sitting by designation.

it had not, Bahel himself waived any claim of immunity by failing to raise the issue until the trial was complete. We also hold that the United Nations Participation Act, which authorizes the payment of the United States' dues to the United Nations, is both a "federal program" and a "benefit" within the meaning of Section 666, which encompasses bribes as well as illegal gratuities. We further hold Section 1346 is broad enough to encompass honest services fraud committed by a foreign worker at the United Nations, that Bahel was properly sentenced as a "public official" under the United States Sentencing Guidelines, Section 2C1.1, and that the district court committed no error in ordering Bahel to pay restitution in the form of remitting a portion of his salary at the United Nations, which amounted to what Bahel was paid during the time he was suspended pending investigation of the conduct underlying his conviction.

**AFFIRMED**.

———————————————

HENRY E. MAZUREK, Clayman & Rosenberg LLP, New York, NY, *for Defendant-Appellant*.

BRENT S. WIBLE (Daniel A. Braun, Alexander J. Willscher, *of counsel*), Assistant United States Attorneys, *for Preet Bharara, United States Attorney for the Southern District of New York*, New York, NY, *for Appellee*.

POOLER, *Circuit Judge*.

This is an appeal from a judgment of conviction entered in the United States District Court for the Southern District of New York (Griesa, *J.*), convicting Appellant Sanjaya Bahel of four counts of use of the mail or wires in furtherance of fraud that deprived the United Nations, his former employer, of its intangible right to his honest services in violation of 18 U.S.C. §§ 1341, 1343, 1346; one count of corrupt receipt of things of value with intent to be rewarded with respect to official business in violation of 18 U.S.C. § 666; and one count of conspiracy in

2

violation of 18 U.S.C. § 371. We hold that the United Nations expressly waived Bahel's immunity, and even if it had not, Bahel himself waived any claim of immunity by failing to raise the issue until the trial was complete. We also hold that the United Nations Participation Act, which authorizes the payment of the United States' dues to the United Nations ("U.N."), is both a "federal program" and a "benefit" within the meaning of Section 666, which encompasses bribes as well as illegal gratuities. We further hold Section 1346 is broad enough to encompass honest services fraud committed by a foreign worker at the U.N., that Bahel was properly sentenced as a "public official" under the Sentencing Guidelines Section 2C1.1, and that the district court committed no error in ordering Bahel to pay restitution in the form of remitting a portion of his salary at the U.N., which amounted to what Bahel was paid during the time he was suspended pending investigation of the conduct underlying his conviction. For the following reasons, the judgment of conviction is affirmed.

## BACKGROUND

The following facts are drawn from the evidence presented at trial, and are presented in the light most favorable to the government. *See United States v. Ivezaj*, 568 F.3d 88, 90 (2d Cir. 2009).

Sanjaya Bahel served as a Chief of the Commodity Procurement Section within the U.N.'s Procurement Division from 1998 to 2003. Beginning around 1999, Nanak Kohli, a long time friend of Bahel's, began to seek business as a supplier to the U.N., with the assistance of his sons, Nishan and Ranjit.[3] As a section chief for the U.N. Procurement Division, Bahel assisted

---

[3] Our convention is to refer to individuals by their surnames; however, because Nanak, Nishan and Ranjit share a common surname, we employ their first names for ease of reference.

3

the Kohlis in their efforts to secure contracts as a U.N. supplier. In connection with the prosecution of Bahel, Nishan Kohli, an indicted coconspirator, became a cooperating witness for the government and the primary source of information regarding Bahel's activities on behalf of the Kohli family.[4]

Bahel's work performance was subject to a variety of U.N. rules, which inform the contours of the duty Bahel owed to his employer. These included (1) an obligation to discharge his job duties with impartiality; (2) to work in the U.N.'s interests; (3) to avoid using his U.N. position for gain; (4) to obtain approval from the Secretary General for gifts; (5) not to have an association with an entity seeking U.N. business; and (6) to disclose any conflicts of interest or be recused in such circumstances. The Government offered evidence at trial to show that Bahel violated these requirements, and by extension, certain federal statutes by providing the Kohli family with inside information on the bidding process for contracts; convincing U.N. employees that the Kohli companies' bids did not raise concerns; counseling the Kohlis on how to win contracts; and assisting in the preparation of documentation to the U.N., without disclosing to the U.N. Bahel's long-term friendship with the Kohlis or the financial benefits that the Kohlis provided to Bahel during the period that his assistance was given.

The Government focused on three U.N. contracts at trial: (1) a 1999 "digital trunking contract"; (2) a 2000 "communications and information technology manpower contract"; and (3) a 2002 "engineering manpower contract." First, in 1999, the Kohli family's company, TCIL, bid for the 1999 digital trunking contract, but was found technically non-compliant. In response, Bahel insisted that Peacekeeping officials hold tutorials with TCIL, which had provided the

---

[4] Nishan was later sentenced to five years probation.

lowest bid, to see if it was possible to overcome technical deficiencies. When officials determined the technical flaws could not be rectified, Bahel sent a letter objecting to the determination. At trial, one official testified that "[i]t did appear to [him] and others within [his] section at the time that [Bahel's] involvement happened on a more regular basis with cases related to TCIL."

Next, in 2000, TCIL won a $30 million contract for manpower support, although the company had no experience in that area. When Peacekeeping learned that TCIL was not providing the Mission Subsistence Allowance ("MSA") stipend to its employees, Peacekeeping sought to cancel the contract. Bahel intervened. He had conversations with the Kohlis, during which they discussed having workers sign letters of satisfaction stating that they had received the MSA or its equivalent. Bahel, along with Nanak Kohli, then met with members of the U.N.'s Office of Legal Affairs. During that meeting, Bahel never disclosed that he and Nanak were "old friends" or that the two previously had "private conversations" regarding the contract. Indeed, Bahel never told the other meeting participants that he "knew [Nanak] in any capacity other than an official one." Thus, the U.N. employees at the meeting believed that Bahel was "acting on behalf of the United Nations" insofar as he was negotiating at the meeting. The product of the meeting was that TCIL and the U.N. eventually agreed that these letters were sufficient to avoid cancellation of the contract. Nishan Kohli would later testify that this resolution did little more than maintain the status quo, because, pursuant to the plan the Kohlis negotiated with Bahel, TCIL "put a lot of pressure on the workers" to sign the letters, by "explain[ing] to them that if they continued to complain the contract could be canceled and they would all be without jobs." TCIL also threatened to "encash" the $2,000 "security deposit"

5

required of all workers, "if they didn't cooperate."

Finally, in 2002, Peacekeeping asked the U.N. to provide engineers for its missions around the world. Nishan testified that his family learned of this request from Bahel more than a month before it was published on the U.N. website. He also testified that Bahel "notified [the Kohlis] that it was coming . . . and that [they] should prepare for it." Nishan testified that this information was beneficial because the Kohli family's new company, Thunderbird, "had not actually registered with the UN so [they] had to go through that process which would take a bit of time." Nishan further testified that "in general early notification was helpful to [them] because [they] weren't really qualified or prepared to ultimately respond to this kind of requirement, so any additional time that [they] could get was helpful." In order to get Thunderbird registered, Nishan stated that "[i]t was [their] intention . . . to basically fake experience" with providing manpower services. Nishan testified that the Kohlis had discussed this approach with Bahel, who they considered "an adviser." Thunderbird's registration was thereafter approved.

When the Kohli family was preparing its bid, Bahel discussed with them the price to bid in order to maximize the chances of obtaining the contract. Indeed, Nishan testified that "[t]he very final numbers that I entered in by hand on the day of submission were read to me by Mr. Bahel and I transcribed them over the telephone while talking to him." In response to queries from the Kohlis regarding their "lack of experience," "Bahel advised [them] that [they] would have to produce some form of experience or [they] wouldn't be qualified." Specifically, he told them to "get, by whatever means, letters stating that [they] had, in fact, this experience."

Later, when Peacekeeping raised concerns about Thunderbird's references, Bahel "gave

6

[the Kohlis] the heads-up on that unofficially and advised [them] to get in touch with the companies in advance and let them know that there would be a call coming from the U.N. and . . . make sure [they] corroborate what [they] said in these letters." Bahel instructed his subordinates to check the references by sending faxes to the relevant addresses, but crippled their ability to do so by allowing them to check on information provided only "on the letters of reference themselves or in the Thunderbird financial proposal." Bahel ultimately told Peacekeeping that the references "checked [] out," were "valid," and that "this was a company with vast international contracts of high dollar amount, and they were performing well around the world."

Bahel signed a request for audited financial statements, which Nishan Kohli testified caused him some "concern," because the Kohlis "didn't have [audited financial] statements" for Thunderbird. The Kohli family discussed the matter with Bahel, who recommended that the Kohlis argue to the U.N. that Thunderbird was "a limited liability corporation and privately owned and therefore not subject to requirements for audited statements." Bahel repeated the same argument internally to U.N. personnel, explaining that "U.S. law did not require limited liability companies to furnish audited statements." When Bahel eventually had to tell the Kohlis that they would not be able to avoid submitting audited financial statements, he was simultaneously working internally at the U.N. to limit their exposure to a full blown audit. Although one of Bahel's subordinates recommended that the U.N. request three years of financial statements, on the ground that the U.N. "should have some history of Thunderbird LLC's financial performance, meaning financial audited statements (or tax return, if they don't have these)," Bahel requested only one year of audited statements from the company.

7

Nishan testified that he was away when the financial statements were due, so, he sent an email to his brother, Ranjit Kohli, with "a draft cover letter . . . for Thunderbird, which [Nishan] wanted [Ranjit] to put on top of the statements that [the Kohlis] would ultimately receive from [the] account and sen[d] to the UN after discussing it with Mr. Bahel." The email also contained certain instructions regarding the submission of the statements. Specifically, Nishan instructed Ranjit: "If possible check with SB if any changes need to be made" to the cover letter, before submitting the statements.

On August 6, 2002, Peacekeeping sent a memo ranking Thunderbird "at the bottom of the list of five" companies bidding for the engineering manpower contract. Peacekeeping found that Thunderbird was only "marginally compliant" and "lack[ed] sufficient documentation as to the company's main product or line of work." Among the concerns was the fact that Thunderbird was not registered with Dun & Bradstreet. In response, Bahel "instructed [the Kohlis] to immediately register with Dun & Bradstreet," which they did.

Thunderbird was required to post a "performance bond" in order to qualify for the contract. Ordinarily, a company would be required to post a $500,000 performance bond, which was also what was specified in the U.N.'s request for proposals regarding this particular contract. However, "when it came to[] Thunderbird the UN wanted an additional amount because [they] were a new company fully registered with the UN and . . . were [only] marginally compliant with the requirement[s]" for the contract. Nishan attended a meeting at the U.N. on this issue. He testified that he "spoke to Mr. Bahel in advance of the meeting unofficially and [Bahel] briefed [him] for what was going to happen in the meeting." Specifically, Bahel "told [Nishan] that [they] would be discussing the audited statements[,] that [they]'d be discussing an enhanced

8

performance bond." Bahel also "gave [Nishan] a bit of insight on Ms. Redfren," Bahel's subordinate, who was scheduled to attend the meeting, including on "her personality and her work patterns." After the meeting took place, Bahel called Nishan to say that the U.N. "had asked for an additional $1 million bond." Bahel also told Nishan "informally that [he] could probably get away with 750 and said to offer half a million and to negotiate from there."

Bahel received a number of financial benefits from the Kohli family in exchange for the assistance he provided. Between 2001 and 2004, he received cash payments from $3,000 to $5,000 on a near monthly basis. The Kohlis also gave Bahel a laptop computer worth more than $2,500. An email sent by Ranjit to Nishan before Bahel had physically received the computer stated "Sanjay doesn't want [the laptop] to . . . mention Kohli anywhere." Bahel received first-class plane tickets to India and seats to the U.S. Open tennis tournament. The most significant financial benefit was Bahel's rental, between October 2003 and April 2005, and eventual purchase, of the Kohli's three-bedroom apartment a few blocks from the U.N. in the Dag Hammarskjold Towers. The Kohlis initially charged Bahel $5,000 per month rent when he first moved into the apartment, though the previous tenant had paid $8,600. Lowering the rent further, Bahel paid no rent for three months of each year of the lease. After the Kohlis purchased the apartment in 2003 for $1.24 million and invested $165,000 in renovations, they sold the apartment to Bahel in May 2005 for $1.2 million. Bahel misrepresented both the amount of rent and the purchase price of the apartment in communications to the board of the building. He also later told the contractor who renovated the apartment to conceal the connection between Bahel and the Kohlis. Nishan testified that, at that time, the market value of the apartment was approximately $1.8 million.

9

Nishan Kohli received a federal subpoena in late 2005, at which point he "notified [Bahel] of the subpoena," who "expressed . . . concern." Both then, and in subsequent conversations, Bahel spoke with Nishan about ways to conceal their relationship. Specifically, Bahel and Nishan "talked back and forth," and Bahel "suggested that [the two] . . . get rid of a few things that could be incriminating for [them]," including "files on [Nishan's] laptop and anything else that . . . might link [the two] together." During these conversations, Bahel also "suggested that [Nishan] just transfer the remaining files that [Nishan] would need from [his] laptop to a new machine and dump the old one altogether, destroy it."

In July 2006, the U.N.'s Procurement Fraud Task Force issued a report detailing a financial relationship between Bahel and the Kohlis. The U.N. referred the report to the United States Attorney's Office. On October 6, 2006, a grand jury returned a sealed indictment against Bahel and Nishan Kohli. The indictment contained six counts. Counts One and Two charged Bahel with defrauding the U.N. of its intangible right to his honest services and using the mails in furtherance of that scheme, in violation of 18 U.S.C. §§ 1341 and 1346. Counts Three and Four charged Bahel with defrauding the U.N. of its intangible right to his honest services and using interstate wire communications to further that scheme, in violation of 18 U.S.C. §§ 1343 and 1346. Count Five charged Bahel with participating in a conspiracy to commit mail and wire fraud, and to corruptly accept things of value with an intent to be influenced or rewarded with respect to the award of U.N. contracts to companies associated with the Kohlis, in violation of 18 U.S.C. § 371. Count Six charged Bahel with the substantive offense of corruptly accepting and soliciting various things of value with the intent to be influenced or rewarded with respect to the

award of U.N. contracts to the Kohli's companies, in violation of 18 U.S.C. § 666(a)(1)(B).[5]

In an October 31, 2006 letter to the U.N., the U.S. Attorney's Office stated that it had "sufficient evidence to bring federal charges against [Bahel] relating to his receipt of things of value from in or about May 2003 through in or about May 2005 with the intent to be influenced and rewarded in connection with his duties as a procurement officer at the United Nations," and requested that the "United Nations waive immunity for United Nations employee Sanjaya Bahel." The United Nations agreed. In a November 1, 2006 letter from the U.N. Under-Secretary-General for Legal Affairs, the organization stated:

> In this case, the Secretary-General has no objection to the waiver of Mr. Bahel's immunity from legal process. . . . [T]he Secretary General has waived, Under Article V, Section 20 of the [U.N.] Convention, the immunity from legal process of Mr. Bahel for purpose of the criminal proceedings initiated by the United States Attorney for the Southern District of New York, for crimes allegedly committed during his employment as a procurement officer at the [U.N.] from in or about May 2003 through in or about May 2005.

A three-week trial in May and June 2007 resulted in Bahel's convictions on all counts. He was sentenced principally to 97 months' imprisonment, ordered to pay $932,165.39 in restitution, and to forfeit $103,500 in currency and title in the Manhattan apartment. The final order of forfeiture was entered on April 20, 2010. Bahel satisfied the restitution portion of the judgment as of July 1, 2011. Bahel has since been released on bail.

* * *

Bahel raises six principal issues on this appeal. In his moving brief, Bahel argues first that the district court lacked jurisdiction to entertain his prosecution because the U.N. did not

---

[5] All counts other than the conspiracy count also charged a violation of 18 U.S.C. § 2, which sets forth certain conditions under which an individual may be held liable as a principal.

11

effectively waive his immunity under the Convention on Privileges and Immunities of the United Nations (the "Convention"), 21 U.S.T. 1418, which was adopted by the U.N. General Assembly on February 13, 1946, and acceded to by the United States on April 29, 1970. Bahel next argues that he was improperly convicted under 18 U.S.C. § 666, because the United States' treaty obligation to the United Nations is not a "federal program" to which the United States provides assistance "benefits" prerequisite to the statute's application. Bahel further argues that district court erred in its charge to the jury on Section 666, because the court failed to instruct the jury that it had to find "corrupt intent" before it could adjudge Bahel guilty of violating the statute. With respect to the honest services conviction, Bahel maintains that Congress's definition of "honest services" does not reach foreign workers at the United Nations, and even if it does, the evidence was insufficient to support his conviction for honest services fraud. Finally, Bahel believes that the district court committed error in enhancing his sentence upon a finding that he was a "public official" and then miscalculated the value of the "rewards" he received as a result of the offenses underlying the conviction.

Between the time Bahel filed his moving brief (December 23, 2008) and his reply brief (July 15, 2009), the United States Supreme Court granted certiorari in *United States v. Black*, 530 F.3d 596 (7th Cir. 2008), *cert. granted*, 129 S. Ct. 2379 (May 18, 2009), to resolve the question of whether a fact finder must find that a fraudulent scheme contemplated economic harm to a victim prerequisite to a finding of liability for violating the honest services fraud statute. Though he had not raised the underlying substantive arguments previously, Bahel argued at length in his reply brief that the outcome in *Black* would bear on his appeal, because there was some question as to whether the Government was required to prove that his scheme to

12

defraud the U.N. caused his victim economic harm. We first heard oral argument in this case on July 8, 2009, but held the appeal in abeyance pending the Supreme Court's determination of the merits of *Black*.

In the meantime, the Supreme Court granted certiorari in two cases presenting related issues: *United States v. Weyhrauch*, 548 F.3d 1237 (9th Cir. 2008), *cert. granted*, 129 S. Ct. 2863 (2009) (question presented: "Whether, to convict a state official for depriving the public of its right to the defendant's honest services through the non-disclosure of material information, in violation of the mail-fraud statute (18 U.S.C. §§ 1341 and 1346), the government must prove that the defendant violated a disclosure duty imposed by state law."), and *United States v. Skilling*, 554 F.3d 529 (5th Cir. 2009), *cert. granted*, 130 S. Ct. 393 (2009) (question presented in relevant part: "Whether the federal 'honest services' fraud statute, 18 U.S.C. § 1346, requires the government to prove that the defendant's conduct was intended to achieve 'private gain' rather than to advance the employer's interests, and, if not, whether § 1346 is unconstitutionally vague."). The Supreme Court heard oral argument in *Black*, *Weyhrauch* and *Skilling*, but issued an opinion only in connection with the substantive issue presented by *Skilling v. United States*. *See* 130 S. Ct. 2896, 2912 n.9 (2010) (vacating and remanding *Black* and *Weyhrauch* in light of *Skilling*). The thrust of that opinion, with respect to the honest services fraud holding, was that honest services fraud under Section 1346 is limited to a bribery and kickback "core," and thus does not include undisclosed conflicts of interest, such as those held by Jeffrey Skilling. *See* 130 S. Ct. at 2907.

Following the Supreme Court's decision, which issued on June 24, 2010, both parties submitted supplemental briefing to this Court. Bahel, in particular, raised a number of new

13

arguments for the first time in his supplemental brief. These related principally to the sufficiency of the indictment and jury charge. With respect to the jury charge, Bahel argued that the district court's instruction was flawed, even though it was a bribery instruction, because it omitted "the essence of bribery: corrupt intent and a quid pro quo agreement." The Government urged that *Skilling* had no impact on Bahel's conviction, in part because the district court gave a bribery instruction, and Bahel was clearly convicted on a bribery theory of liability. We heard oral argument on January 13, 2011, regarding the impact of *Skilling* on this case. Concluding now, as we do, that neither *Skilling* nor any other relevant precedent compels a contrary conclusion, we affirm the judgment of conviction entered by the district court.

## DISCUSSION

### I. Immunity and Waiver

U.N. officials are granted immunity from prosecution pursuant to Article V, Section 18 of the Convention on Privileges and Immunities of the United Nations (the "U.N. Convention"), Feb. 13, 1946, 21 U.S.T. 1418, entered into force with respect to the United States Apr. 29, 1970, which states in relevant part that U.N. officials are "immune from legal process in respect of words spoken or written and all acts performed by them in their official capacity." *Id.* art. V, § 18(a). Section 20 of the Convention provides that: "Privileges and immunities," such as immunity from prosecution, "are granted to officials in the interests of the United Nations, and not for the personal benefit of the individuals themselves." *Id.* art. V, § 20. Only the Secretary General may waive the immunity of a U.N. official. *Id.*

Bahel argued for the first time after his trial that the U.N. had not waived his immunity for the subject matter of the prosecution. Bahel bases this claim in part on a contention that the

14

Diplomatic Relations Act ("DRA"), 22 U.S.C. § 254d, provides him with the right to raise a claim of immunity. However, as the Government points out, the DRA applies only to diplomats, and not to other officials, like Bahel. Instead, the International Organization Immunities Act ("IOIA"), 59 Stat. 669, 22 U.S.C. §§ 288 et seq., governs Bahel's right to raise a claim of immunity—the IOIA expressly applies to "officers and employees of [international] organizations," and states that such individuals "shall be immune from suit and legal process relating to acts performed by them in their official capacity and falling within their functions as . . . officers, or employees except insofar as such immunity may be waived by the . . . international organization concerned." *Id.* § 288d(b).

Bahel further contends that Article II, Section 2 of the U.N. Convention would only allow for his prosecution had there been an express waiver of his immunity by the U.N., which he maintains never occurred. Article II, Section 2 provides that "[t]he *United Nations* . . . shall enjoy immunity from every form of legal process except insofar as in any particular case it has expressly waived its immunity." U.N. Convention art. II, § 2, 21 U.S.T. 1422 (emphasis added). Although the plain language of this provision suggests otherwise, Bahel contends that it applies *both* to the U.N. as an organization and to its employees. *But see id.* art. V, § 18 (addressing immunity for certain U.N. employees deemed "officials"). From this faulty assumption, Bahel deduces that a waiver of immunity by the Secretary General as to an employee or official must be *express* in order to be valid—because the U.N. as an organization may only waive *its* own immunity (as conferred on the organization) expressly. While Bahel maintains that his immunity was expressly waived as to conduct between May 2003 and May 2005, he also maintains that the charges against him relate only to conduct that occurred prior to May 2003, for which there was

15

no express waiver, and accordingly, Bahel argues that those charges should have been dismissed for lack of subject matter jurisdiction. We disagree.

As a threshold matter, we note that the plain language of Article II leaves no doubt that the U.N. can only waive immunity for itself, as an organization, expressly. *See id.* art. II, § 2 ("The United Nations . . . shall enjoy immunity from every form of legal process except insofar as in any particular case it has *expressly* waived its immunity." (emphasis added)); *see also Brzak v. United Nations*, 597 F.3d 107, 112 (2d Cir. 2010) (recognizing that the U.N. must expressly waive immunity). However, Article V, which covers immunity for "officials," lacks that same plain language. Instead, Article V Section 20 states that: "Privileges and immunities are granted to officials in the interests of the United Nations and not for the personal benefit of the individuals themselves. The Secretary-General shall have the right and the duty to waive the immunity of any official in any case where, in his opinion, the immunity would impede the courts of justice and can be waived without prejudice to the interests of the United Nations." U.N. Convention art. V, § 20.

Bahel's contention that an express waiver is required for officials is based largely on case law interpreting Article II, which is limited to the U.N.'s immunity as an organization—not Article V, which covers officials. *See, e.g.*, *Emmanuel v. United States*, 253 F.3d 755, 756 (1st Cir. 2001) (noting that Article II immunity would apply to the U.N. Mission in Haiti, in light of the U.N.-Haiti Status of Forces Agreement that extended Article II immunity to the Mission); *Askir v. Boutros-Ghali*, 933 F. Supp. 368, 371, 373 (S.D.N.Y. 1996) (dismissing the complaint sua sponte as against the U.N. organization because Article II rendered the U.N. immune from suit). Further, the only two cases cited by Bahel that directly analyze Article V are wholly

16

inapposite. One involved a situation where a party failed to argue that immunity had been waived. *See De Luca v. United Nations Org.*, 841 F. Supp. 531, 535 (S.D.N.Y. 1994) ("Here, plaintiff has not alleged that the U.N. has waived the immunity of the[] four [individual] defendants."). The other involved a situation wherein the U.N. had expressly declined to waive immunity for one of its employees. *See McGehee v. Albright*, 210 F. Supp. 2d 210, 218 n.7 (S.D.N.Y. 1999) (noting that the Under-Secretary-General for Legal Affairs for the United Nations "informed the Court that the United Nations is not waiving its immunity in this action as to defendant [Secretary-General Kofi] Annan.").

The absence of an express waiver requirement in Article V, coupled with a lack of precedent to the contrary, leaves us unable to conclude that Article V unequivocally requires an express waiver in order to be effective. *Accord* Restatement (Third) of Foreign Relations Law § 456(1)(a), (2)(c) and cmt. b (1987) (explaining that in the absence of an express waiver requirement, waiver by a state can be effected "either expressly or by implication"); *compare also* IOIA, 22 U.S.C. § 288a(b) ("*International organizations*" are immune from suit in federal courts "except to the extent that such organizations *expressly waive* their immunity. . . ." (emphasis added)), *with id.* § 288d(b) ("*[O]fficers and employees* of [international] organizations shall be immune from suit and legal process . . . except insofar as such immunity *may be waived* . . . ." (emphasis added)). This determination, however, does not alter the outcome of this case, because we conclude that the U.N. expressly waived Bahel's immunity.

In response to the Government's request that the U.N. "waive any claim of immunity," the U.N. sent a letter to the Government, dated November 1, 2006, stating: the "Secretary-General has no objection to the waiver of Mr. Bahel's immunity from legal process." The letter

17

further stated that the U.N. waived "the immunity from legal process of Mr. Bahel for the purpose of the criminal proceedings initiated by the United States Attorney for the Southern District of New York, for crimes allegedly committed during his employment as a procurement officer at the UN from in or about May 2003 through in or about May 2005."

Although the letter did include specific dates, that is "in or about May 2003" to "in or about May 2005," we believe that the circumstances surrounding the U.N.'s participation in Bahel's investigation and prosecution make pellucid that reference to the dates in the letter was intended only to identify the criminal proceedings that had been initiated by the United States Attorney for the Southern District of New York—not to limit the scope of the waiver. It is significant that the U.N. itself referred the matter of Bahel's prosecution to the United States Attorney's Office and cooperated at all stages of the prosecution, including by providing relevant documents and waiving immunity for several employees who testified at Bahel's trial. Further, in a second letter dated January 14, 2008, the U.N. confirmed that its first letter was intended fully to waive Bahel's immunity. Indeed, at no point did the U.N. object to the scope of the proceeding.

Even if there had been no express waiver of Bahel's immunity by the U.N., Bahel himself impliedly waived any claim of immunity when he participated fully in the criminal proceedings without raising the issue of immunity until after the trial. *See Richardson v. Fajardo Sugar Co.*, 241 U.S. 44, 46-47 (1916) (holding that a defendant who appeared, filed answers to an original and several amended complaints, set a trial date, and first raised the defense of sovereign immunity eights months after the action began had waived the defense). Though there is limited case law addressing waiver under the U.N. Convention, which is the operable document in the

18

case *sub judice*, we have previously stated that diplomatic immunity from prosecution may be waived. *See United States v. Lumumba*, 741 F.2d 12 (2d Cir. 1984). In *Lumumba,* we explained: "Even if by a stretch of the imagination one could assume the existence of such status [diplomatic immunity], it was waived in this case. Lumumba, a member of the Michigan bar, freely chose to appear *pro hac vice* in the United States District Court to represent a criminal defendant. It would be anomalous to believe that he could participate in a trial as counsel . . . without subjecting himself to the district court's contempt procedures." *Id.* at 15.

At least two of our sister circuits have expressed similar views. In *Holloway v. Walker*, 800 F.2d 479 (5th Cir. 1986), the Fifth Circuit explained that although it did not believe that Appellant was entitled to plead diplomatic immunity, to the extent he was, "this right was waived by his action in withholding such plea until the unsuccessful termination of such litigation." *Id.* at 481. More recently, in *United States v. Campa*, 529 F.3d 980 (11th Cir. 2008), the defendant, as here, waited until after the trial to raise the issue of immunity, and then argued that the district court had lacked jurisdiction to entertain an action against him in the first instance. *Id.* at 1001. Although defendant's argument in *Campa* was based on his purported sovereignty under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602-11, which expressly states that waiver can be implied, *id.* § 1605(a)(1) ("A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver . . . ."), the underlying conduct at issue in *Campa* nevertheless informs our analysis. That is, in that case, the Eleventh Circuit

19

emphasized that the defendant had waived his right to invoke immunity through his "long and active participation in the action." 529 F.3d at 1001 (citing *Richardson*, 241 U.S. at 47). Here too, Bahel was present throughout the pendency of his prosecution and never raised the defense of immunity. The time to raise the issue has long since passed. Having participated fully in the action, he is now bound by its outcome. Accordingly, although we find that the U.N. effectively and expressly waived Bahel's immunity in its letter to the Government, we also hold in the alternative that Bahel waived his right to invoke immunity by waiting until after the trial to raise the issue.

## II.     18 U.S.C. § 666

Having resolved the question of immunity from prosecution, we turn to Bahel's substantive arguments regarding the bases of his conviction. Bahel was charged and convicted under Count Six of violating 18 U.S.C. § 666(a)(1)(B) by accepting compensation as a " reward" for the favors he provided to the Kohlis. With respect to this count, Bahel first argues that "[n]o reading of [18 U.S.C. § 666] could plausibly be extended to the charges in this case," because "[t]he United States' membership in the United Nations is not a 'federal program' under [Section] 666(b), and the contributions made to the United Nations under the United States treaty obligation in the U.N. Convention and Charter is not a 'benefit' or 'form of Federal assistance' under that same sub-section." Bahel argues accordingly that Section 666 cannot reach the conduct at issue in this case. We disagree.

### A.     Application of Section 666 to the U.N.

Title 18 U.S.C. § 666 makes it a crime for "an agent of an organization" to "corruptly solicit[] or demand[] for the benefit of any person, or accept[] or agree[] to accept, anything of

20

value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization . . . involving any thing of value of $5,000 or more[.]"  To prosecute an organization's agent under 18 U.S.C. § 666, the organization must "receive[], in any one year period, *benefits* in excess of $10,000 under a *Federal program* involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."  18 U.S.C. § 666(b) (emphasis added).  In *United States v. Zyskind*, 118 F.3d 113 (2d Cir. 1997), we construed a "Federal program" to mean "there must exist a specific statutory scheme authorizing the Federal assistance in order to promote or achieve certain policy objectives."  *Id.* at 115 (internal quotation marks omitted) (holding that 38 U.S.C. §§ 301 et seq. was a federal program insofar as it authorized payment of federal benefits to United States' veterans).  Thus, there is a "federal program" for the purposes of Section 666 whenever there is a specific statutory scheme that authorizes payments thereunder for the purposes of promoting or achieving the policy objectives of the United States.

The Supreme Court has provided additional guidance on determining what constitutes a "benefit" for the purposes of Section 666.  In *Fischer v. United States*, 529 U.S. 667 (2000), the defendant was convicted under Section 666 for defrauding a hospital that had received Medicare funds.  *Id.* at 670.  On appeal, the defendant argued that the Medicare program provided "benefits" only to patients who received subsidized medical care, and not to hospitals, which merely received reimbursements from the government for services rendered.  *Id.* at 676.  The Supreme Court disagreed, noting that:

> To determine whether an organization participating in a federal assistance program receives "benefits," an examination must be undertaken of the program's structure, operation, and purpose.  The inquiry should examine the conditions under which the organization

21

receives the federal payments. The answer could depend, as it does here, on whether the recipient's own operations are one of the reasons for maintaining the program.

*Id.* at 681. Applying this approach, the Supreme Court determined that Medicare payments constituted a "benefit" because the federal funds provided an advantage for both the patient who received the medical care, as well as for the hospital; such payments ensured the hospital's continued viability and thus advanced the policy objectives of the federal government. *Id.* at 679-80. The Court wrote: "the payments might have similarities to payments an insurer would remit to a hospital quite without regard to the Medicare program," *id.* at 679, in which case they might be considered exempt under Section 666(c), which removes from the statute's coverage any "bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business," 18 U.S.C. § 666(c). However, the Government would not make any of the payments at issue in *Fischer* "unless the hospital complie[d] with its intricate regulatory scheme," 529 U.S. at 679. Thus, the Supreme Court noted, "[t]he payments are made not simply to reimburse for treatment of qualifying patients but to assist the hospital in making available and maintaining a certain level and quality of medical care, all in the interest of both the hospital and the greater community." *Id.* at 679-80. The payments, therefore, could be considered "benefits" subject to the strictures of Section 666.

On the facts of this case, the United Nations Participation Act ("U.N. Participation Act"), 22 U.S.C. § 287e, which authorizes payment of the United States' dues to the U.N., can be considered to establish a "benefit" program much as the Medicare Act was considered to establish a benefit program in *Fischer*. Through the U.N. Participation Act, Congress has authorized appropriations of "such sums as may be necessary for the payment by the United

22

States for its share of expenses of the Organization as apportioned by the General Assembly."

22 U.S.C. § 287e. Because Congress authorized payments through the U.N. Participation Act,

the United States' payments to the U.N. are made are made under "a specific statutory scheme"

that aims to advance the government's foreign policy objectives, specifically, the policy of

participating in collective endeavors to secure the benefits of world peace. *Accord Zyskind*, 118

F.3d at 115. Further indicative of a benefits program, the United States' funding of the U.N.,

like the Medicare funding at issue in *Fischer*, is subject to several conditions designed in part to

promote broader objectives related to national security while ensuring that any money

contributed to the U.N. is responsibly expended and accounted for. *Cf. Fischer*, 529 U.S. at 677-

78. For example, through the United Nations Reform Act of 1999, *see* Consolidated

Appropriations Act 2000, Pub. L. No. 106-113, §§ 901-952, 113 Stat. 1501, 1501A-475-485

(1999), Congress established a number of restrictions that are imposed on the U.N. as a condition

of federal funding. These include (1) requiring that the U.N. maintain a balanced budget, *see*

§ 941(b)(3); (2) requiring that the U.N. conduct evaluations of its programs and make

recommendations about which programs should be terminated, *see id.* § 941(b)(4); (3) capping

the growth of the budgets of U.N. agencies, *see id.* § 941(b)(8), (10); (4) preventing the U.N.

from borrowing from outside lenders, *see id.* § 921(a)(7)(A); and (5) limiting the United States'

contribution to the U.N. to an amount below what the U.N. had assessed, *see id.* §§ 931(b),

941(b)(1).

The U.N. Reform Act also sets forth a host of anti-corruption measures that the U.N. is

required to implement. For example, (1) each U.N. agency must have an inspector general; (2)

the U.N. must maintain whistle-blower protections; (3) there must be procedures in place to

23

ensure that the U.N. complies with the Inspector Generals; (4) the U.N. must permit member states to access any report issued by the Inspector Generals; and (5) the U.N. must guarantee that the United States General Accounting Office has access to the U.N.'s financial data in order to perform audits of U.N. operations. *See id.* § 941(b)(2), (6). The U.N. Reform Act further regulates the U.N.'s staff and requires the U.N. to implement policies to ensure that all staff are appointed on the basis of merit, maintain a code of conduct, require senior employees to make financial disclosures, impose rules against nepotism, and maintain a personnel evaluation system. *See id.* § 941(b)(7).

Finally, in addition to the U.N. Reform Act, Congress has adopted certain other measures designed to regulate the U.N.'s activities. These include the Kassebaum-Solomon Amendment to the Foreign Relations Authorization Act for fiscal years 1986 and 1987, which required the U.N. to change its internal voting mechanisms to ensure that voting rights were proportionate to the financial contributions of each member state and to alter the previous requirement that U.N. staff return their salaries to their home governments. *See* Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, Pub. L. No. 99-93, §§ 143, 151, 99 Stat. 405, 424, 428 (1985) (codified as notes to 22 U.S.C. § 287e); *see also* Department of State Authorization Act, Fiscal Years 1982 and 1983, Pub. L. No. 97-241, § 109, 96 Stat. 273, 276 (1982) (codified as note to 22 U.S.C. § 287r) (prohibiting contributions to the United Nations Educational, Scientific and Cultural Organization "if that organization implements any policy or procedure . . . to censor or otherwise restrict the free flow of information within or among countries . . . ."); Department of State Authorization Act, Fiscal Years 1984 and 1985, Pub. L. No. 98-164, § 115, 97 Stat. 1017, 1021 (1983) (codified as note to 22 U.S.C. § 287) (providing that the United States shall not

participate in the U.N. if Israel is illegally expelled as a member organization); Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 2002, Pub. L. No. 107-77, § 404, 115 Stat. 748, 789 (2001) (codified as note to 22 U.S.C. § 287e) (prohibiting the U.N. from establishing a system of taxation for the internet or international currency transactions); Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Pub. L. No. 103-236, § 410, 108 Stat. 382, 454 (1994) (codified as note to 22 U.S.C. § 287e) (prohibiting the U.N. from granting diplomatic recognition to entities that do not meet the internationally recognized attributes of statehood); Foreign Relations Authorization Act, Fiscal Years 1990 and 1991, Pub. L. No. 101-246, § 414, 104 Stat. 15, 78 (1990) (codified as note to 22 U.S.C. § 287e) (providing that dues paid by the United States will not be available to the U.N. if it accords the Palestine Liberation Organization the same standing as a member state).

The above restrictions, which are tied directly to funding, make clear that the United States' payment of dues to the U.N., similar to Medicare funding, "provide[s] *benefits* extending beyond isolated, point-of-sale . . . transactions," *Fischer*, 529 U.S. at 681 (emphasis added). That is, the U.N. is not a contractor and funding to the U.N. is not merely payment for goods and services provided to the United States. Rather, the funding provided to the U.N. by the United States fulfills "significant purposes beyond performance of an immediate transaction," including the advancement of policy goals. *Id.* at 680. And here, as in *Fischer*, the "Government has a legitimate and significant interest in prohibiting financial fraud or acts of bribery being perpetuated" at the organization receiving federal funds. *Id.* at 681.

Bahel argues that, regardless of whether the United States' payments to the U.N. can be considered "benefits," the payment of dues to the U.N. cannot constitute a "federal program" as

25

that phrase is used in Section 666, because the United States agreed in a treaty (i.e., the United Nations Charter) to make such payments to the U.N.  However, there is no question that a federal statute duly enacted by Congress, the U.N. Participation Act, is what authorizes the payment of the United States' dues to the U.N.  Under the principles articulated in *Zyskind*, this is sufficient to classify the U.N. Participation Act as a "federal program."  *See* 118 F.3d at 115.

Moreover, as a constitutional matter, the United States cannot provide any funds to the U.N. without an express and independent authorization by Congress.  *See* U.S. Const. art. I, § 8, cl. 1.  Indeed, in order for a treaty to be self-executing, and thus not require independent action from Congress, the treaty's terms must reflect such an intention by both the President, who negotiated it, and the Senate, which provided its advice and consent.  *See Medellin v. Texas*, 552 U.S. 491, 519 (2008) (distinguishing *Comegys v. Vasse*, 1 Pet. 193 (1828), as "stand[ing] only for the modest principle that the terms of a treaty control the outcome of a case"); *accord Brzak v. United Nations*, 597 F.3d 107, 111 (2d Cir. 2010) ("In determining whether a treaty is self-executing, we look to the text, the negotiation and drafting history, and the postratification understanding of the signatory nations."); Restatement (Third) of Foreign Relations Law § 111 cmt. i ("Constitutional restraints on self-executing character of international agreement: An international agreement cannot take effect as domestic law without implementation by Congress if the agreement would achieve what lies within the exclusive law-making power of Congress under the Constitution.  Thus, an international agreement providing for the payment of money by the United States requires an appropriation of funds by Congress in order to effect the payment required by the agreement.").

The text of Articles 17 and 19 of the U.N. Charter reflect no such understanding.  Article

26

17 provides that "[t]he expenses of the [U.N.] shall be borne by the Members as apportioned by the General Assembly." U.N. Charter art. 17, para. 2. Article 19 provides that the remedy for a breach of the obligation to pay dues is the loss of a member's vote in the General Assembly. *Id.* art. 19. As the Government points out, the fact that the U.N. Charter provides for a diplomatic remedy in the event of a nation's non-compliance with its Charter obligations strongly suggests that the dues provision of the United Nations Charter was not meant to be self-executing. Further, as the Supreme Court explained in *Medellin v. Texas*, the absence of mandatory language (i.e., "must" or "shall") indicates that a particular provision is not a self-executing directive. 552 U.S. at 508 (failure to include mandatory terms in Article 94 of the U.N. Charter, including incorporation of directives "shall" or "must," indicated that Article 94 was not a "directive").

Accordingly, we conclude that the payment of the United States' dues to the U.N. is a "Federal program," because there is a specific statutory scheme authorizing the assistance, i.e., the U.N. Participation Act. Further, the U.N. Participation Act plainly seeks to promote the United States' foreign policy objectives, and thus is properly considered a "benefit" subject to the strictures of 18 U.S.C. § 666. Therefore, we reject Bahel's argument that Section 666 cannot reach employees of the United Nations.

B.     **Bahel's As-Applied Challenge to Section 666**

Bahel challenges Section 666 on as-applied constitutional grounds, arguing that the statute is unconstitutional as applied to him because Congress did not exercise its spending power to bind the United States to its treaty obligations under the U.N. Charter. As explained above, Bahel's as-applied challenge to Section 666 is a variation on his argument that the U.N.

27

does not receive benefits under a federal program because the United States is obligated by treaty to pay U.N. dues. This argument fails for one fundamental reason: Congress has the power to grant or revoke federal funding to the U.N. based on its independent policy judgments; therefore, the allocation of federal funding to the U.N. is an exercise of the spending power. *See Sabri v. United States*, 541 U.S. 600, 605 (2004). It is well-settled that "Congress has authority under the Spending Clause to appropriate federal moneys to promote the general welfare, and it has corresponding authority under the Necessary and Proper Clause to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare, and not frittered away in graft or on projects undermined when funds are siphoned off or corrupt public officers are derelict about demanding value for dollars." *Id.* (internal citations omitted). Pursuant to this principle, a number of officials of non-governmental organizations have been prosecuted under Section 666 in various jurisdictions across the country. *See, e.g.*, *Fischer v. United States*, 529 U.S. 667 (2000) (executive of medical consulting firm); *United States v. Hildenbrand*, 527 F.3d 466 (5th Cir. 2008) (president of construction company doing business with a non-profit housing organization); *United States v. Buck*, 324 F.3d 786 (5th Cir. 2003) (executive of non-profit rural development organization); *United States v. Edgar*, 304 F.3d 1320 (11th Cir. 2002) (executive officers of hospital); *United States v. Dubón-Otero*, 292 F.3d 1 (1st Cir. 2002) (lawyer and doctor who were directors for health services corporation); *United States v. Neighbors*, 23 F.3d 306 (10th Cir. 1994) (pharmacist at clinic run by charitable community health organization). We see no principled basis on which to distinguish congressional authorization of the payment U.N. dues from federal monies flowing to these non-governmental organizations. Accordingly, Bahel's as-applied constitutional challenge to Section 666 fails.

28

## III.  Honest Services Fraud

Bahel next argues that he was improperly charged with honest services fraud for a number of different reasons, each of which is outlined below.  In relevant part, the indictment included four counts of honest services fraud: Counts One and Two charged Bahel with defrauding the U.N. of its intangible right to his honest services facilitated by his use of the mails in violation of 18 U.S.C. §§ 1341 and 1346, and Counts Three and Four charged Bahel with defrauding the U.N. of its intangible right to his honest services facilitated by his use of interstate wire communications, in violation of 18 U.S.C. §§ 1343 and 1346.

In *Skilling v. United States*, 130 S. Ct. 2896 (2010), the decision for which we held this appeal in abeyance, the Supreme Court considered the constitutionality of the honest services fraud statute codified at 18 U.S.C. § 1346.  That case involved the actions of Jeffrey Skilling, a longtime Enron officer, and Enron's chief executive officer from February until August 2001 (when he resigned).  *Id.* at 2907.  During his time at Enron, Skilling was alleged to have "profited from the fraudulent scheme . . . through the receipt of salary and other bonuses, . . . and through the sale of approximately $200 million in Enron stock, which netted him $89 million." *Id.* at 2934 (internal quotation marks).  Less than four months after Skilling resigned from Enron, the company declared bankruptcy.  *Id.* at 2907.  The indictment charged Skilling "with conspiracy to commit securities and wire fraud; in particular, it alleged that Skilling had sought to 'depriv[e] Enron and its shareholders of the intangible right of [his] honest services.'"  *Id.* at 2908.  Relevant to the honest services charge, Skilling was alleged to have "conspir[ed] to defraud Enron's shareholders by misrepresenting the company's fiscal health, thereby artificially inflating its stock price."  *Id.* at 2934.  Notably, however, "Skilling [never] solicited or accepted

side payments from a third party in exchange for making these misrepresentations." *Id.*

In determining the scope and constitutionality of the honest services statute, the Supreme Court adopted a limiting construction, explaining that "[t]o preserve the statute without transgressing constitutional limitations," Section 1346 could not reach Skilling's conduct. *Id.* at 2931. Therefore, the Court held that Section 1346 criminalizes only "fraudulent schemes to deprive another of honest services through bribes or kickbacks. . . ." *Id.* at 2928. Defining the scope of "bribes and kickbacks," the Supreme Court wrote that the statute's "prohibition on bribes and kickbacks draws content not only from the pre-*McNally* case law, but also from federal statutes proscribing—and defining—similar crimes."[4] *Id.* at 2933 (citing 18 U.S.C. §§ 201(b), 666(a)(2); 41 U.S.C. § 52(2)). In reaching this holding, the Supreme Court rejected the Government's argument that § 1346 should also encompass "undisclosed self-dealing by a public official . . . [such as] the taking of official action by the [official] that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." *Id.* at 2932 (internal quotation marks and citation omitted). Because the Government in *Skilling* did not allege that Skilling accepted bribes or kickbacks, but rather that he was engaged in a pattern of self-dealing, the Supreme Court determined that Skilling's honest services fraud conviction was flawed and vacated the Fifth Circuit's affirmance of Skilling's conspiracy conviction. *Id.* at 2934-35.

Bahel argues for the first time on appeal that Section 1346 cannot apply to foreign

---

[4] In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court invalidated the long-accepted common law theory of mail and wire fraud relating to the deprivation of "intangible rights." The year after *McNally* was decided, Congress enacted Section 1346, which effectively overruled *McNally* and reinstated the line of cases preceding it. *See United States v. Rybicki*, 354 F.3d 124, 136-37 (2d Cir. 2003) (en banc).

employees of the U.N.  Specifically, he asserts that Section 1346 has only been applied to government or private sector employees, not employees of international organizations.  *See, e.g.*, *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) (applying Section 1346 to former mayor of Bridgeport, Connecticut).  In support of his argument, Bahel cites *United States v. Giffen*, 326 F. Supp. 2d 497 (S.D.N.Y. 2004), *United States v. Lazarenko*, No. 00 Cr. 284 (N.D. Cal. May 7, 2004), and this Court's decision in *United States v. Rybicki*, 354 F.2d 124 (2d Cir. 2003) (en banc).  Although we agree with Bahel that Section 1346 is not limitless, we hold that it is broad enough to encompass Bahel's actions and neither *Giffen* nor *Lazarenko* nor *Rybicki* provides otherwise.

Bahel argues that this Court's holding in *Rybicki* stands for the proposition that honest services fraud is effectively limited to the identity of the actors prosecuted in the pre-*McNally* caselaw.  That is, he states that because "[n]one of [the pre-*McNally*] cases extended an 'honest services' theory of fraud to an international setting involving foreign nationals," *Rybicki* means that he, as a foreign national, cannot be prosecuted for honest services fraud under Section 1346. We disagree.  *Rybicki*, like *Skilling*, stands for the proposition that fraud actionable under Section 1346 is limited to the nature of the offenses prosecuted in the pre-*McNally* cases (i.e., bribery and kickback schemes)—not the identity of the actors involved in those cases.  *See Rybicki*, 354 F.3d at 138-44; *see also Skilling*, 130 S. Ct. at 2931 ("To preserve the statute without transgressing constitutional limitations, we now hold that § 1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law." (emphasis in original)).

*United States v. Giffen* is equally unhelpful to Bahel's position.  That case involved a United States citizen who was charged with honest services fraud for bribing a government

31

official from the Republic of Kazakhstan, resulting in the deprivation of honest services for Kazakh citizens. 326 F. Supp. 2d at 499-500. The district court, finding a "total absence of . . . precedent supporting the Government's overseas application of the intangible rights theory," *id.* at 505, ruled that "Congress did not intend that the intangible right to honest services encompass bribery of foreign officials in foreign countries," *id.* at 506. Although Bahel urges to the contrary, *Giffen* does not dictate the outcome of this case, not only because this Court has not itself so construed Section 1346, but also because, unlike in *Giffen*, the conduct at issue in this case took place within the territorial United States, and the victim was—not a foreign government's citizens—but the United Nations, an organization headquartered in the United States, entitled to defendant's honest services in the United States, and receiving its largest financial contributions from the United States.

*United States v. Lazarenko* is also distinguishable. That case, which was cited in *Giffen*, involved a former prime minister of the Republic of Ukraine, who was charged with depriving Ukranian citizens of the honest services of their government officials. No. 00 Cr. 284, at *1-2. At the close of evidence, the district court dismissed, inter alia, two counts of honest services fraud charged in violation of 18 U.S.C. §§ 1343, 1346. *Id.* at *3-4. In so doing, the district court stated that, in order to establish honest services fraud, the Government would have had to plead and prove "an analogous violation of Ukraine law." *Id.* at *4. This proposition has since been rejected by the Ninth Circuit. *See United States v. Weyhrauch*, 548 F.3d 1237 (9th Cir. 2008), *vacated and remanded on other grounds by* 130 S. Ct. 2971 (2010) (vacating in light of *Skilling*). That is, the Ninth Circuit has rejected the notion that a deprivation of honest services requires a underlying violation of state law in a domestic case. *Id.* at 1245 ("In short, we have never

32

limited the reach of the federal fraud statutes only to conduct that violates state law.").

*Lazarenko* is also at odds with precedent in our Circuit. *See United States v. Margiotta*, 688 F.2d 108, 124 (2d Cir. 1982) ("At the outset, we reject the contention that absent a showing of a violation of New York statute or a duty imposed by New York law, a defendant may not be found guilty of using the mails in furtherance of a scheme to defraud on the basis of a breach of a fiduciary duty to the citizenry."), *overruled on other grounds by McNally v. United States*, 483 U.S. 350 (1987); *see also United States v. Murphy*, 323 F.3d 102, 115-16 & n.5 (3d Cir. 2003) (discussing the different approaches to honest services fraud as between the circuits). Accordingly, *Lazarenko* does not provide a basis on which to vacate Bahel's conviction.

We note that Bahel's conduct falls firmly within the ambit of the type of conduct that violates the right to honest services as set forth in relevant precedent. *See, e.g.*, *United States v. Hasenstab*, 575 F.2d 1035 (2d Cir. 1978) (buyer for airline convicted of mail and wire fraud for receiving kickbacks from a supplier of business forms and computer paper in return for the buyer routing orders to the supplier, and giving the supplier advance information regarding its competitors' bids on contracts offered by the employer). Thus, we conclude that, on the facts of this case, Section 1346 reaches Bahel's conduct.

## IV.    Belated Challenges to the Indictment and Jury Charge

Bahel also appeals his conviction under both Section 1346 and Section 666 on the ground that the indictment failed to charge Bahel with bribery, and the district court failed to adequately instruct the jury on bribery, principally because the district judge omitted a "corrupt intent"

33

element prerequisite to a conviction for bribery.[5] Specifically, Bahel argues for the first time on appeal that without an instruction on "corrupt intent," he was convicted on an "illegal gratuities" theory rather than a bribery theory of liability. This was impermissible, Bahel argues, because both Section 666 and 1346 reach only fraud that rises to the level of bribery.

At oral argument held after the Supreme Court issued is decision in *Skilling*, the Government expressed its belief that Section 1346 does not encompass illegal gratuities, an argument it concluded was foreclosed by *Skilling*. Accordingly, the question of whether honest services fraud can be premised on a gratuity theory of liability is not before us and we do not consider it. However, with respect to Section 666, the Government argues that Section 666 covers both illegal gratuities as well as bribery, and therefore to the extent that Bahel was convicted under Section 666 as having accepted illegal gratuities, but not bribes, this is not a basis on which to overturn his conviction.

Generally, "[w]e review challenged jury instructions de novo [and] will reverse only if all of the instructions, taken as a whole, caused a defendant prejudice." *United States v. Bok*, 156 F.3d 157, 160 (2d Cir. 1998). A "jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Id.* Further, where a defendant fails to make a specific and timely objection to a district court's legal instructions, we typically review those instructions only for plain error. *See United States v. Middlemiss*, 217 F.3d 112, 121 (2d Cir. 2000). However, where the source of alleged error is a supervening

---

[5] Because the challenge to the indictment rests on the same facts and reasoning as Bahel's challenge to the jury instructions, and therefore, fails for the same reasons, we discuss Bahel's arguments only in the context of the jury charge, with the understanding that the logic underlying our reasoning applies equally to both.

34

decision, as here with *Skilling* and the charge under Section 1346, we have previously employed

a "modified plain-error" rule, under which "the government, not the defendant, bears the burden

to demonstrate that the error . . . was harmless." *United States v. Henry*, 325 F.3d 93, 100 (2d

Cir. 2003) (internal quotation marks omitted). The Government argues that our modified plain

error rule has not survived the Supreme Court's decision in *Johnson v. United States*, 520 U.S.

461 (1997). We need not reach this issue, however, since we conclude there was no error in the

jury charge.

### A.      The Honest Services Jury Charge

Bahel first argues that the jury instructions were flawed because the district court's

bribery charge omitted two important elements—corrupt intent and quid pro quo

agreement—thereby effectively converting it into a "gratuity instruction." However, the district

court's charge included language nearly identical to what the Supreme Court has described as the

core of honest services fraud. The charge read in relevant part as follows:

> It is now essential that you understand specifically what is covered
> by the third of these elements relating to the scheme to deprive the
> United Nations of the intangible right to the defendant's honest
> services. What is referred to is that the United Nations had certain
> fundamental rules and regulations specifying how activities by
> United Nations employees were to be carried out. The government
> charges that the scheme consisted of violation of these rules and
> regulations in the following manner: The government charged that
> the defendant [A] provided information to the Kohlis which was not
> available to other prospective bidders for U.N. business; [B] provided
> unofficial advice and guidance to the Kohlis when the Kohlis were
> seeking U.N. business which was not available to other prospective
> bidders; [C] advocated the position of the Kohlis on issues that arose
> in connection with the Kohlis' attempt to obtain or maintain business
> with the U.N. in a manner the defendant did not use with other
> bidders; [D] *accepted financial benefits from the Kohlis in return for
> these forms of assistance*. . . . If the defendant violated the
> fundamental rules and regulations of the United Nations through the

activities described above, and concealed such violations with the intention of deceiving the United Nations, this would be the crime covered by the statute.

In *Skilling*, the Supreme Court defined classic kickbacks as involving the receipt of something of value from a third party "*in exchange for*" official action. 130 S. Ct. at 2926 (emphasis added). This language is strikingly similar to the district court's instruction to the jury that it could convict Bahel of honest services fraud if it found that he provided the Kohlis with one or more specific forms of assistance in his capacity as a UN employee, and that he "accepted financial benefits from the Kohlis *in return for* these forms of assistance."

Further, the Supreme Court's holding in *Skilling* was consistent with its prior holdings in such cases as *United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999), where the Court distinguished bribes from gratuities. *Sun-Diamond* involved a trade association's illegal gifts to the Secretary of Agriculture, and in that case, the Supreme Court defined the crime of bribery as requiring a specific intent to "give or receive something of value *in exchange* for an official act." *Id.* at 404-05 (emphasis in original). The Court explained that this connection to an official act is what distinguishes bribery from gratuities; an illegal gratuity "may constitute merely a *reward* for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." *Id.* at 405 (emphasis added). The district court's instruction on Section 1346 in this case did not incorporate the word "reward" nor did it discuss an analogous concept. Indeed, the district court did not even refer to Section 666 in the context of the Section 1346 instruction, which is significant because Section 666 does cover illegal gratuities, as we explain below.

During the interval between the Supreme Court's decisions in *Sun-Diamond* and *Skilling*,

36

this Circuit had an opportunity to consider the differences between bribery and gratuities as set forth in *Sun-Diamond*. In *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007), we explained that "in order to establish the quid pro quo essential to proving bribery, the government need *not* show that the defendant intended for his payments to be tied to specific official acts (or omissions)." *Id.* at 148 (internal quotation marks omitted, emphasis added). Rather, "bribery can be accomplished through an ongoing course of conduct, so long as evidence shows that the 'favors and gifts flowing to a public official [are] *in exchange for* a pattern of official actions favorable to the donor.'" *Id.* at 149 (internal quotation marks omitted). Thus, contrary to Bahel's assertions, it is not necessary, though it may be advisable, for the district judge to use the magic words "corrupt intent" or "quid pro quo" to effectively charge a jury on bribery.[6] Rather,

_____

[6] Although there may be disagreements among the circuits as to whether honest services fraud requires a showing of "quid pro quo" contemporaneous with the bribe—that is, whether a specific act to be completed must be identified at the time of the promise to compensate the actor, *see Sun-Diamond*, 526 U.S. at 406—our Circuit has adopted the view that any such requirement is limited to bribery as codified 18 U.S.C. § 201, and therefore, has no application in the honest services fraud context. *See Ganim*, 510 F.3d at 145-46; *see also United States v. Whitfield*, 590 F.3d 325, 352-53 (5th Cir. 2009) ("Whether we adopt the Third and Ninth Circuit's conclusion that *Sun-Diamond* applies . . . to honest services fraud but that a particular act need not be identified at the time of payment, or the Second Circuit's conclusion that *Sun–Diamond* does not apply to honest services fraud at all, we arrive at the same result.").

While the Supreme Court discussed *Sun-Diamond* and also made reference to a number of circuit splits in its opinion in *Skilling*, it did not resolve this particular issue. *See Skilling*, 130 S. Ct. at 2928 n.36 (noting circuit splits on whether Section 1346 "prosecutions must be based on a violation of state law; whether a defendant must contemplate that the victim suffer economic harm; and whether the defendant must act in pursuit of private gain" (citations omitted)). We note, however, that even within circuits that impose a contemporaneous quid pro quo requirement, courts have held that the magic words "quid pro quo" do not themselves need to be used. *See, e.g.*, *Whitfield*, 590 F.3d at 353. As the Fifth Circuit held in *Whitfield*, "The law only requires that the Government prove the 'specific intent to give or receive something of value *in exchange* for an official act' to be performed sometime in the future." *Id.* (quoting *Sun-Diamond*, 526 U.S. at 404-05). The charge in this case instructed the jury that it could convict if it found that Bahel took money and other compensation from the Kohlis "in return for" certain

37

as we explained in *United States v. Alfisi*, 308 F.3d 144, 149 (2d Cir. 2002), "[t]he 'corrupt' intent necessary to a bribery conviction is in the *nature* of a quid pro quo requirement; that is, there must be a 'specific intent to give . . . something of value *in exchange for* an official act." *Id.* (emphasis added). In this vein, we find the "in return for" language in the district court's instruction rests comfortably within the statutory requirement.

### B.     The Section 666 Jury Charge

With respect to Bahel's arguments regarding the failure of the indictment to charge bribery under Section 666, and the district court's omission of a "corrupt intent" instruction thereunder, we find both arguments to be without merit. The crux of Bahel's argument is that the jury charge was flawed because without express mention of "corrupt intent," the Section 666 charge instructed the jury only on an illegal gratuity theory, and Section 666, Bahel contends, is limited to garden variety bribery. As set forth in full detail below, we find that the district court adequately charged the jury on the elements of a violation of Section 666, and that to the extent the verdict sheet indicated that Bahel had been convicted on a gratuities theory (i.e., "intent to be rewarded" for official acts), Section 666 is broad enough to encompass an illegal gratuity theory of liability.

Section 666(a)(1)(B) provides that an agent of an organization that receives benefits in excess of $10,000 under a federal program, in any one year period, is guilty of an offense if he "corruptly . . . accepts, or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of

enumerated official actions. We think this suffices for liability, even under the more exacting limitations imposed by *Sun-Diamond*.

such organization . . . ." 18 U.S.C. § 666(a)(1)(B). We have held that Section 666 extends to both bribes—where the thing of value is part of a quid pro quo, and gratuities—where the thing of value is a "reward" rather than a bargained-for exchange. For example, in *United States v. Crozier*, 987 F.2d 893 (2d Cir. 1993), we held that a prior version of Section 666, which is identical in all material ways to the current version of the statute, applied to both illegal gratuities and bribes. *Id.* at 898-99.

Although Congress amended Section 666 in 1986, those amendments had no effect on the statute's applicability to illegal gratuities, and we have continued to hold that the current version applies to illegal gratuities as well as to bribes. *See United States v. Bonito*, 57 F.3d 167, 171 (2d Cir. 1995). Indeed, in *Bonito*, the appellant argued that the amendments to Section 666 warranted reconsideration of the scope of the statute and its relationship to illegal gratuities. *Id.* We rejected that argument, noting that "the deleted language ha[d] been replaced with language that is to the same effect." *Id.* Specifically, we noted that under the former version of Section 666, the payment had to be "for or because of" official conduct, whereas the current version provides that the payment must be "to influence or reward" the official conduct. *Id.* (citations and internal quotation marks omitted).

Later, in *United States v. Ford*, 435 F.3d 204, 211 (2d Cir. 2006), we reiterated our earlier holding that Section 666 applies to both bribes and gratuities, noting that the statute it was designed to supplement, 18 U.S.C. § 201, criminalizes both. 435 F.3d at 210-11. In *Ford*, we observed, among other things, the distinction between bribes and gratuities, noting that:

> The distinguishing feature of each crime is its intent element. Bribery requires intent "to influence" an official act or "to be influenced" in an official act, while illegal gratuity requires only that the gratuity be given or accepted "for or because of" an official act.

39

> In other words, for bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act. An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken.

*Id.* at 210 (quoting *Sun-Diamond*, 526 U.S. at 404-05 (emphasis in original)). Thus, we have made clear that Section 666 extends to both bribes and gratuities.

The jury charge on Section 666 in this case provided in relevant part that "it is the law that if an employee of the UN conducts certain UN business in a perfectly honest and proper manner and later accepts a financial benefit intending to be rewarded for that past activity, this is a violation of the law." The district court further instructed: "In general, it would seem that the intent to be influenced would apply to UN business, that is taking place or will take place in the future. The normal meaning of intent to be rewarded would seem to be the intent to be rewarded for conduct which has occurred in the past." The jury was asked to fill out a special verdict form for the Section 666 charge. This form bifurcated the bases on which a defendant could be found guilty. The form provided that the jury was to identify whether the defendant was guilty because he accepted payments and other compensation with "(A) Intent to be influenced," or "(B) Intent to be rewarded." The jury did not indicate yes or no in response to criteria (A), but indicated "yes" in response to criteria (B). We find the intent to be rewarded language to be sufficient to indicate that the jury convicted Bahel under Section 666 at least on the ground that he accepted illegal gratuities.[7] *See Alfisi*, 308 F.3d at 149 ("The element of a quid pro quo or a direct

---

[7] We note also that the fact that the Section 666 conviction was premised on an "intent to be rewarded" rather than an "intent to be influenced" theory of liability does not, without more, create an inconsistent verdict. To the extent that the Section 1346 verdict could only have been premised on an intent to be influenced theory, the jury was silent on the verdict sheet as to

40

exchange is absent from the offense of paying an unlawful gratuity. To commit that offense, it is enough that the payment be a reward for a past official act or made in the hope of obtaining general good will in the payee's performance of official acts off in the future.").

Bahel argues that even on a gratuities theory, the jury charge was erroneous because it provided for a conviction for receiving "gifts or 'rewards' without first having a corrupt agreement."  In order for a conviction to have been proper, Bahel contends that the charge would have had to specify that Bahel "had been corrupted at the time he acted in his official business." In support of his argument, Bahel cites a footnote in *United States v. Jennings*, 160 F.3d 1006 (4th Cir. 1998).  In *Jennings*, the Fourth Circuit opined that a House Report accompanying a narrowing amendment to 18 U.S.C. § 215, a provision parallel to Section 666 that prohibits the fraudulent giving of payments rather than their receipt, had "an arguable implication for § 666 that *Crozier* did not mention: that Congress changed § 666, by adding the "corruptly . . . with intent to influence or reward" language, to clarify that § 666 (like § 215) prohibits *only* bribes" *Id.* at 1015 n.4 (citing George D. Brown, *Stealth Statute-Corruption, the Spending Power, and the Rise of 18 U.S.C. § 666*, 73 Notre Dame L. Rev. 247, 308-11 (1998)).  Bahel concedes that the Fourth Circuit's discussion in *Jennings* is dicta that was wholly ancillary to the central issue in that case.  Moreover, insofar as it is directly at odds with precedent in this jurisdiction, we find it unpersuasive.

In *United States v. Rooney*, 37 F.3d 847 (2d Cir. 1994), we considered the meaning of the

---

whether it accepted or rejected this theory of liability with respect to the Section 666 verdict. Further, the jury is presumed to follow the instructions given, *see Richardson v. Marsh*, 481 U.S. 200, 211 (1987), and we conclude there was no error in either the district court's Section 1346 or Section 666 instructions.

41

term "corrupt" as used in Section 666, concluding that "a fundamental component of a 'corrupt' act is a breach of some official duty owed to the government or the public at large." *Id.* at 852. We concluded that "[i]t is an obvious violation of duty and public trust for a public official or some other person responsible for parceling out government benefits to accept or demand a personal benefit intending to be improperly influenced in one's official duties." *Id.* at 853 (collecting cases). Although *Rooney* involved bribery, our analysis of Section 666 in that case, coupled with the plain language and what we referred to as the "conspicuous breadth" of that section, *id.* at 852, makes clear that, in the case of a gratuity, the corrupt intent required under Section 666 refers to an individual's state of mind at the time the payment is received—Section 666 makes it illegal, inter alia, "to corruptly . . . accept, anything of value from any person, intending to be . . . *rewarded* in connection with any business, transaction, or series of transactions of such organization." 18 U.S.C. § 666(a)(1)(B) (emphasis added). Accordingly, we find no error in the district court's instructions to the jury insofar as they provided that the jury could convict Bahel under Section 666 based on an illegal gratuity theory, and because we conclude that Section 666 covers illegal gratuities, we also find no error in charges in the indictment relating to Section 666 insofar as they were premised on a gratuity theory of liability.

## V. Sufficiency of the Evidence

Bahel challenges his conviction with regard to sufficiency of the evidence on two grounds. First, he argues that the Government failed to prove that he participated in a scheme to materially deprive the U.N. of its right to honest services and that he acted with the specific intent to defraud. Second, with respect to count three of the indictment, which charged wire fraud, Bahel argues that the Government failed to prove beyond a reasonable doubt that an

42

August 6, 2002 interstate phone call made from Nishan to his father, Nanak, for the purpose of "discuss[ing] a message from Bahel that Thunderbird needed to immediately register with Dun & Bradstreet" was in furtherance of the honest services fraud scheme. (The Government alleged that Bahel made an intrastate phone call to Nishan to warn him to immediately register with Dun & Bradstreet, which led Nishan to make the interstate phone call to Nanak regarding registration with Dun & Bradstreet, which, in turn, resulted in Nishan registering Thunderbird with Dun & Bradstreet later that same day.) Viewing the evidence in this case in its totality, and in the light most favorable to the Government, as we are obliged to do, *see United States v. Temple*, 447 F.3d 130, 136-37 (2d Cir. 2006), we are unable to conclude that no reasonable juror could have found liability, *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

A.      **Evidence of Honest Services Fraud**

In the first instance, the evidence established that Bahel received financial benefits from the Kohlis worth hundreds of thousands of dollars as a direct result of the assistance he provided to them, including by advocating on behalf of TCIL with respect to certain stipends and by providing advice regarding the falsification of references. The evidence also demonstrated that Bahel repeatedly engaged in secretive and misleading conduct to prevent the U.N. from discovering the existence and nature of his relationship with the Kohlis. This evidence included, for example, proof that Bahel was integral in helping the Kohlis obtain the $30 million Thunderbird engineering manpower contract, despite the fact that they "weren't really qualified" and were otherwise unprepared to incur the obligations thereunder. The Kohlis discussed their lack of qualifications with Bahel, which rather than dissuade him, appears to have strengthened his resolve. Bahel directed the Kohlis to "fake experience" and later submitted false reference

43

letters to the U.N. with respect to the Kohlis' credentials. When U.N. officials were suspicious of the authenticity of the letters, Bahel contacted the Kohlis, cautioning them that U.N. representatives would be checking their references and that the Kohlis should ensure that those vouching for them through the letters were prepared to "corroborate" the information. Bahel then became involved with the reference checking process and imposed certain requirements that insured that his fraud would not be discovered: he allowed his subordinates to verify the Kohlis' references only by sending a fax to the number provided by the Kohlis; Bahel prevented his subordinates from contacting the references directly via telephone. Bahel also falsely told Peacekeeping officials, his supervisor, and the Headquarters Committee on Contracts, which approved award of the contract, that the Kohlis references "checked [] out."

Additionally, Bahel communicated a number of other lies and half truths to help the Kohlis win the contract. For example, in order to allay the U.N.'s concerns about Thunderbird's ability to perform, Bahel staged a meeting between himself, a subordinate and Nishan Kohli. Prior to that meeting, Bahel and Nishan "talked about the issues of our financials for the company . . . the company financials . . . [and] the enhanced performance bond that was going to be asked for." At the meeting, Nishan discussed "those issues of the bond, of the financials" with Bahel and his subordinate, who was not aware that Bahel had prepped Nishan for the conversation. After that meeting, Bahel called Nishan to tell him that the U.N. had asked for an enhanced performance bond in the amount of $1 million. Bahel then told Nishan "informally that [he] could probably get away with 750," and instructed him to "offer half a million and . . . negotiate from there."

Bahel later falsely promised Peacekeeping that the U.N. would require the winning

44

vendor to pass along the entire MSA payment to its employees. But as soon as Bahel had secured the contract for Thunderbird, he instructed that the contract be drafted to permit Thunderbird to keep the MSA. When questions were raised regarding Thunderbird, Bahel prevented his subordinates from examining Thunderbird's audited financial statements. And in order to ensure that Thunderbird encountered limited competition in obtaining the contract, he inserted a $15 million revenue requirement into the engineering manpower contract, even though, at that time, the U.N. was "trying to promote competition" in order to "get the best possible price." Further, Bahel advised the Kohlis on a number of specifics regarding their Thunderbird bid—he reviewed the bid prior to submission and helped the Kohlis formulate a strategy for responding to the U.N.'s complaints regarding their lack of audited financial statements.

With respect to TCIL, Bahel compelled Peacekeeping to provide tutorials to the Kohlis/TCIL after their technical proposal on the digital trunking contract was found to be wholly inadequate in that it gave "no detail of what they were offering" and "fail[ed] to meet the majority of the criteria set out in the [request for proposals]. . . ." One official testified that Bahel's involvement with procurement "happened on a more regular basis with cases related to TCIL," and that it was uncommon for procurement officials to conduct the kind of tutorial that had been conducted for the Kohlis. Bahel even drafted or reviewed a portion of the Kohlis' correspondence with the U.N. before the Kohlis sent it.

Moreover, throughout the course of their relationship, Bahel passed significant amounts of insider information to the Kohlis. This included revealing specific problems that Peacekeeping had with the Thunderbird bid, and instructing the Kohlis to immediately register

Thunderbird with Dun & Bradstreet in order to placate certain U.N. employees who expressed concern that Thunderbird was not registered. Bahel also revealed the identities of the other likely bidders to the Kohlis, which gave them a tactical advantage in assessing the winning price and then told them that their bid was the lowest, even though all of that information was to be kept confidential.

The evidence demonstrated that Bahel was well compensated in exchange for his assistance. He received a computer, loans and an option to purchase an apartment worth more than one million at a severely discounted price. Bahel attempted to cover his tracks with respect to these items. Bahel never disclosed his relationship with the Kohlis to any U.N. employee. He used a secret cell phone that the Kohlis paid for in order to conceal his conversations with the Kohlis. Bahel instructed the Kohlis to disguise their involvement when they bought him a laptop computer; lent money in his name; and rented, and then sold, him the apartment. Bahel misrepresented the amount of rent and purchase price of the apartment in communications to the board of the building. He told the contractor who renovated the apartment to conceal the connection between Bahel and the Kohlis. When Nishan Kohli was served a subpoena, Bahel counseled him to destroy evidence of their relationship and suggested alternate false explanations about their conduct. From this and other conduct the jury was entitled to infer that Bahel violated his duty to provide the U.N. with his honest services.

Bahel asserts that the government failed to show that his misrepresentations or omissions in discussing the Kohlis' companies with U.N. personnel were material. There was significant evidence to the contrary, and there is no serious question that the instances chronicled above were material as we have defined that term—"they [had] the natural tendency to influence or

46

[were] capable of influencing the [U.N.] to change its behavior." *United State v. Rybicki*, 354 F.3d 124, 147 (2d Cir. 2003). In particular, it is beyond cavil that U.N. personnel were less inclined to investigate the Kohlis' companies as a direct result of Bahel's assurances and his efforts to downplay the need for verifying the Kohlis' past experience. This evidence, along with substantial evidence of financial benefits received from the Kohlis, supports the conclusion that Bahel intentionally participated in a scheme of honest services fraud at the U.N.

B.      Evidence of Wire Fraud

With respect to Bahel's second challenge to the sufficiency of the evidence, relating to whether the Government proved beyond a reasonable doubt that the phone call between Nishan and Nanak was in furtherance of the honest services fraud scheme, the relevant facts are as follows. In July 2002, the Kohlis submitted their Thunderbird bid relating to a U.N. engineering manpower contract. On August 6, 2002, Peacekeeping sent a memo to Bahel regarding the five bids submitted for the contract. The memo listed a number of deficiencies with Thunderbird's bid, and recommended that Peacekeeping "undertake a legal review of [Thunderbird's] arrangement with [the Delhi State Industrial Development Corporation Limited], as well as a Dun & Bradstreet report on Thunderbird Industries." But Thunderbird was not registered with Dun & Bradstreet. Accordingly, Bahel, who was in New York, called Nishan, who was also in New York, to discuss the fact that "somebody within the evaluating team pointed out that Thunderbird did not even have a Dun & Bradstreet registration." During that conversation, Bahel "instructed [Nishan] to immediately register with Dun & Bradstreet." Contemporaneous with the discussion Nishan had with Bahel, Nishan called his father, Nanak, who was in Virginia, to discuss the Dun & Bradstreet issue. Nishan registered Thunderbird with Dun &

47

Bradstreet later that day. Bahel disputes none of these facts.

Rather, the basis for Bahel's appeal relates to a call Nishan received from Diana Mills-Aryee also on August 6, 2002. On that day, Mills-Aryee telephoned Nishan to inquire as to the status of Thunderbird's Dun & Bradstreet report. One of Bahel's subordinates, Jane Redfern, was with Mills-Aryee when Mills-Aryee made the call. Redfern testified that she recalled Mills-Aryee relaying that Thunderbird was "in the process of registering." Bahel argues that this testimony fails to establish beyond a reasonable doubt that he had contacted Nishan *before* Mills-Aryee, and therefore, calls into doubt whether he caused the interstate communication between Nishan and Nanak. We disagree and instead conclude that a rational jury could conclude that Bahel made a phone call to Nishan, instructing him to register with Dun & Bradstreet in relation to the Thunderbird contract bid, and that the call in turn caused Nishan to make the interstate phone call to Nanak.

To prove a charge of honest services wire fraud, the Government must show that the defendant sent or *caused* to be sent an interstate or international wire communications and that such wire communication occurred in furtherance of a fraudulent scheme. *See United States v. Slevin*, 106 F.3d 1086, 1089 (2d Cir. 1996). To meet the "in furtherance" requirement, a wire communication "need not be an essential element of the scheme. It is sufficient for the [wire communication] to be incident to an essential part of the scheme or a step in [the] plot." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989) (internal citations and quotation marks omitted). Further, it is not necessary for the defendant to participate personally in the wire transmission, as long as it is reasonably foreseeable that the charged transmission would occur in the execution of the scheme. *See, e.g.*, *United States v. Amico*, 486 F.3d 764, 781 (2d Cir. 2007)

48

(applying the "reasonably foreseeable" standard in the context of a mailing).

Here, Redfern testified that she was with Mills-Aryee when Mills-Aryee telephoned Nishan, and that Nishan told Mills-Aryee during that conversation that he was "in the process of registering" Thunderbird with Dun & Bradstreet. "[C]rediting every inference that the jury might have drawn in favor of the government," *Temple*, 447 F.3d at 136-37 (internal quotation marks omitted), Nishan's testimony indicates that he was already aware that Thunderbird needed to be registered with Dun & Bradstreet by the time Mills-Aryee made the call. Since the only other source of this information was Bahel, the evidence establishes that Bahel notified Nishan informally before Mills-Aryee called him in an official capacity.

On the facts of this case, however, the timing of the various phone calls is of only limited importance, because even if Bahel had contacted Nishan after Mills-Aryee, it was reasonably foreseeable to Bahel that, by contacting Nishan, the call between Nishan and Nanak would occur in furtherance of the scheme. *See Amico*, 486 F.3d at 781 ("To prove that a defendant caused a mailing, it is sufficient to prove that he could have reasonably foreseen that the mailing would take place."). The jury was thus entitled to find that the phone call from Bahel conveyed precisely the type of internal assistance that Bahel provided to the Kohlis—and not to other vendors—that violated U.N. procurement policies and formed the basis of his conviction for honest services fraud.

## VI.  Sentencing

Bahel was sentenced to 97 months' imprisonment, based on a total offense level of 30 and a criminal history category of I. Bahel's base offense level was calculated as 14, because the district court considered him to be a "public official" and therefore applied Sentencing

49

Guidelines Section 2C1.1(a)(1). The district court enhanced this base level by an additional 14

levels, applying Section 2C1.1(b)(2), because the district court found that the fraud involved

gains to Bahel in excess of $400,000, *see* U.S.S.G. § 2B1.1(b)(1)(H), at 80 (14 level

enhancement for loss exceeding $400,000). Finally, the district court enhanced his sentence by

two additional levels based upon a finding that Bahel had obstructed justice. The sentence range

for a total offense level of 30 is 97-121 months, and Bahel's sentence of 97 months'

imprisonment falls at the low end of the Guidelines range. Bahel appeals only the calculation of

the base offense level under Section 2C1.1 and the imposition of a 14 level enhancement based

on the computed value of his crimes. He does not appeal the 2 level enhancement for

obstruction of justice. In addition to imprisonment, the district court ordered Bahel to pay

restitution, a judgment that he also appeals.

### A.  Application of the Sentencing Guidelines

When reviewing district court determinations as to the sentencing guidelines, we review

factual findings for clear error and legal interpretations de novo. *United States v. Lenoci*, 377

F.3d 246, 250 (2d Cir. 2008). A finding of fact is clearly erroneous only if, after reviewing all of

the evidence, a court "is left with the definite and firm conviction that a mistake has been

committed." *United States v. Cuevas*, 496 F.3d 256, 267 (2d Cir. 2007) (internal quotation

marks omitted).

### 1.  Fraud Involving Public Officials

Guidelines Sections 2B1.1 and 2C1.1 can both apply to mail and wire fraud convictions.

*See* U.S.S.G. app. A., at 546 (2008). Section 2B1.1 applies generally to mail and wire fraud and

carries a base offense level of 7. U.S.S.G. § 2B1.1, at 80 ("Theft, Embezzlement, Receipt of

Stolen Property, Property Destruction, And Offenses Involving Fraud or Deceit"). Section 2C1.1, subtitled in relevant part, "Fraud Involving the Deprivation of the Intangible Right to Honest Services of *Public Officials*" (emphasis added), is more narrowly tailored than Section 2B1.1 in that it carries a base offense level of 14 if the offender is a public official. U.S.S.G. § 2C1.1(a)(1), at 127. Because the district court determined that Bahel was a "public official" as that phrase is used in the Sentencing Guidelines, it subjected Bahel to Section 2C1.1's base offense level rather than the lower offense level of Section 2B1.1.

In its definitions, Section 2C1.1 provides that the phrase "'Public Official' shall be construed broadly." U.S.S.G. § 2C1.1, cmt. n.1, at 128. A "public official" includes, inter alia, a "member of a state or local legislature," an "officer or employee or person acting for or on behalf of a state or local government, or any department, agency, or branch of government thereof," as well as appointed officials and individuals who have been elected and are waiting to take office. *Id.* Moreover, as relevant here, the definition includes a catchall provision that defines a "public official" as "[a]n individual who, although not otherwise covered by [the other] subdivisions [of the definition] . . . (i) is in a position of public trust with official responsibility for carrying out a government program or policy; (ii) acts under color of law or official right; or (iii) participates so substantially in government operations as to possess de facto authority to make governmental decisions (*e.g.*, which may include a leader of a state or local political party who acts in the manner described in this subdivision)." *Id.*

Bahel argues that he should not have been sentenced under Section 2C1.1, because he was not a "public official," in that he (a) did not possess official authority to enter into contracts; (b) was not involved in policymaking in working on contracts for goods and services, and

otherwise did not hold a high-level position at the U.N.; and (c) as a U.N. employee, he did not hold a position in government.  We reject these arguments.

First, the fact that Bahel was at an international organization (i.e., the U.N.) does not mean that he was not a "public official" for the purposes of Section 2C1.1.  The district court correctly noted that the closely analogous Guidelines provision found in Section 2B4.1, which relates to commercial bribery offenses, demonstrates the applicability of Section 2C1.1 to this case.  The commentary to Section 2B4.1 states: "This guideline covers commercial bribery offenses and kickbacks that do not involve officials of federal, state, or local government, foreign governments, *or public international organizations*."  U.S.S.G. § 2B4.1, cmt. n.1, at 118 (emphasis added).  As the district court noted, the commentary to Section 2B4.1 refers the reader to part C, for "Offenses Involving Public Officials, if any such officials are involved." *Id.*  Part C includes Section 2C1.1, which is the section under which Bahel was sentenced.  The district court further noted that insofar as Section 2B4.1 refers the reader to part C for offenses involving public international organizations, this commentary plainly indicates that part C was meant to encompass employees of the U.N., since the U.N. is undoubtedly a public international organization.

Other provisions of the Sentencing Guidelines support this analysis.  For example, commentary to Section 2C1.1 provides that the term "'Public official' shall be construed broadly."  U.S.S.G. § 2C1.1, cmt. n.1, at 128  Section 2C1.1 is not limited to those who work for a federal, state or local government, but has been applied to leaders of political parties, officials of Indian tribes, and foreign public officials.  *See* U.S.S.G. § 2C1.1, cmt. n.1(E) & background, at 129-31.  Indeed, the phrase "public official" encompasses any individual who either (1) is in a

52

position of public trust with official responsibility for carrying out a government program or policy; (2) acts under color of law or official right; or (3) possess de facto authority to make governmental decisions. *See* U.S.S.G. § 2C1.1, cmt. n.1(E), at 129.

Additionally, although Bahel argues to the contrary, it is difficult to imagine how he could not be considered a high ranking U.N. official, since he was *Chief* of the Commodity Procurement Section within the U.N.'s Procurement Division. While this position may not have been the same as that of a representative of a member state, it is far from the "baggage porter" to which Bahel now seeks to compare himself. That is, Bahel cites *Krichman v. United States*, 256 U.S. 363 (1921), in support of his argument that employees with purely ministerial jobs cannot ever be subject to prosecution as public officials. This argument misapprehends the holding in *Krichman*.

*Krichman* involved a defendant who was indicted under the 1909 bribery law for offering a bribe to a baggage porter "to deliver to him [the defendant] certain trunks containing furs, which were checked from the Pennsylvania station to points outside the state of New York." *Id.* at 364. At that time, the federal government was in control and operated the railroads, so the porter was a federal employee. *Id.* at 363-64. As the Supreme Court noted, "In order to sustain the conviction [under the 1909 bribery law] the bribe must have been given to an officer of the United States, or to a person acting for or on behalf of the United States in an official function under or by the authority of a department or office of the government." *Id.* at 365. In holding that the defendant could not be convicted for bribery under the 1909 statute, the Supreme Court explained that neither Krichman nor the porter were officers of the United States. Thus, the only question was whether the porter was "acting for the United States in an official function" when

53

he was offered the bribe.  *Id.*  Noting that the government had conceded the statute's ambiguity, the Supreme Court concluded that the ambiguity regarding the statute's scope, were "not to be solved so as to embrace offenses not clearly within the law."  *Id.* at 368.  The Supreme Court was especially persuaded by the fact that the Congress could not have contemplated that the statute would apply to railroad workers, because the United States did not control the railroads at the time the statute was passed.  *Id.* at 365-66.

Here, not only do the Guidelines expressly refer to the sentencing of individuals at public international organizations as appropriately considered in the context of part C, but Bahel's position, at the U.N., as can be garnered from his title alone, was closer to that of a foreign diplomat, political party official, or a tribal leader, all of whom are expressly covered by the Guideline—than that of a baggage porter, window cleaner, doorkeeper or any of the other tasks recounted in *Krichman*.  *See id.* at 366.  Our conclusion is further supported by the fact that the Convention on Privileges and Immunities of the United Nations would have entitled Bahel to invoke immunity in the first instance on the basis that he is an official.  *See* U.N. Convention, art. V, § 18 ("Officials").  Guidelines Section 2C1.1's commentary also includes a note that suggests its direct applicability to individuals like Bahel: "Section 2C1.1 also applies to offenses under [the Foreign Corrupt Practices Act] . . . [which] generally involve a payment to a foreign public official, candidate for public office, or agent or intermediary, with the intent to influence an official act or decision of a foreign government or political party."  U.S.S.G. § 2C1.1, cmt. background, at 131.

Bahel contends that Section 2C1.1's definition of "public official" cannot be extended to include "all employee of international non- or quasi-governmental organizations, such as the

54

U.N., the World Trade Organization, or the Internal Monetary Fund." However, as the district court recognized, the Guidelines commentary specifically instructs that employees of such "public international organizations," fall under Section 2C1.1 and not Section 2B1.1. Bahel also argues that even if "public official" extended to a broad range of organizations, he could not have been considered a "public official," because he "was not making policy decisions or executing government programs." The Guidelines reject this argument, providing in relevant part that: "a state employee who improperly influenced the award of a contract and used the mails to commit the offense may be prosecuted under 18 U.S.C. § 1341 for fraud involving the deprivation of the intangible right of honest services. Such a case would be more aptly sentenced pursuant to § 2C1.1." *See* U.S.S.G. § 2B1.1, cmt. n.15, at 96. Further, Section 2C1.1 contains a four-level enhancement for those public officials who are in a "high-level decision-making or sensitive position," clearly indicating that the Section 2C1.1 was not meant to reach *only* those high level officials. *See id.* § 2C1.1(b)(3), at 127.

Bahel argues for the first time on appeal that to the extent that he could be considered a public official, he was sentenced under the wrong portion of the Sentencing Guidelines because he was convicted only on a gratuity theory under Section 666, as indicated on the verdict form returned by the jury, but he was sentenced under a bribery portion of the Guidelines. Bahel's argument ignores the fact that, in addition to violating Section 666, he was also convicted of honest services fraud under 18 U.S.C. §§ 1341, 1343, 1346, and he was sentenced under the portion of the Guidelines that applies to honest services fraud. Specifically, the Sentencing Guidelines provide that violations of 18 U.S.C. § 666 may be sentenced under either Sections 2B1.1, 2B1.5, 2C1.1 or 2C1.2, the latter of which applies, inter alia, to receipt and solicitation of

55

gratuities, *see* U.S.S.G. app. A, at 543.  The Guidelines also provide that violations of Sections 1341 and 1343 are to be sentenced under either Section 2B1.1 or 2C1.1.  However, the Guidelines do not provide that honest services fraud convictions under Sections 1341 and 1343 are to be sentenced under the 2C1.2 gratuities Guideline, *see* U.S.S.G. app. A, at 546.  Accordingly, we find no error in the district court's application of Section 2C1.1 with a base offense level of 14 to Bahel.

### 2.      Proceeds from the Fraud

The district court enhanced Bahel's sentence by 14 levels based on the court's observation that Bahel gained in excess of $400,000 from the fraud.  *See* U.S.S.G. §§ 2B1.1(b)(1)(H), 2C1.1(b)(2), at 80, 127.  Bahel claims that this enhancement was in error because the district court's calculation of the benefits he received was based on speculative evidence.  We disagree.

Much of the case law relating to estimating the price of fraud relates to estimations of losses suffered as a result of the fraud.  In this case, however, the relevant measurement is how much Bahel profited from his fraud.  In calculating this number, the principles relating to estimating losses are equally applicable to estimating gains.  In estimating the cost of fraud, the "Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision."  *United States v. Bryant*, 128 F.3d 74, 75 (2d Cir. 1997).  The sentencing court "need only make a reasonable estimate of the loss, given the available information."  *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009) (internal quotation marks omitted); *see also* U.S.S.G. § 2B1.1, cmt. n.3(C), at 87.  Disputed facts relevant to sentencing determinations should be supported by a preponderance of the evidence.  *See, e.g.*, *United States v. Garcia*, 413

F.3d 201, 220 n.15 (2d Cir. 2005).  Because the sentencing court "is in a unique position to

assess the evidence and estimate the loss based upon that evidence," its findings are "entitled to

appropriate deference" on appeal.  U.S.S.G. § 2B1.1, cmt. n.3(C), at 87.  "In reviewing a district

court's application of the Guidelines to the specific facts of a case," this Court will "accord de

novo review to issues of law, and accept its findings of fact unless they are clearly erroneous."

*United States v. Guang*, 511 F.3d 110, 122 (2d Cir. 2007).

The district court estimated Bahel's gains to be $514,126, by aggregating the following

(relevant values in bold):

- The difference between Bahel's stated purchase price for the Manhattan apartment, which had been approved by the condominium board ($1.5 million) and what Bahel actually paid ($1.2 million), for a benefit of **$300,000**;

- The difference between Bahel's stated purchase price of the Manhattan apartment ($1.5 million) and a conservative estimate of the apartment's fair market value ($1.6 million), for a benefit of **$100, 000**;

- The value of the free rent Bahel received in connection with the Manhattan apartment (**$40,000**);

- The difference between the fair market value of rent for the Manhattan apartment and what Bahel paid (**$38,000**);

- Cash payments totaling **$5,500**;

- First-class plane tickets worth **$16,000**, as well as other plane tickets worth **$10,000**;

- U.S. Open tickets worth **$2,000**;

- A laptop computer worth **$2,626**.

Bahel does not object to the district court's findings regarding rent, plane tickets, cash or other

gifts.  He objects only to the fair market valuation of the apartment, and argues that the district

court erred in (1) failing to take into account the $27,000 that Bahel paid in closing costs, (2)

failing to consider the fact that the Condo Board was willing to sell Bahel its right of first refusal, which Bahel argues indicated that the apartment was not sold at a "material discount" (because otherwise the Condo Board would have exercised its right and bought the apartment itself), and (3) failing to account for the $90,000 that the Kohlis saved by not having to pay commission to a real estate broker.

To the extent that the fact that the Condo Board sold its right of first refusal to Bahel instead of exercising it, this fact could be considered probative of the fair market value of the apartment, because, as Bahel points out, it could indicate that the apartment was not valued much (if at all) below market.[8]  However, in this case, the balance of the evidence indicates exactly the opposite—that the apartment was worth far more than Bahel paid.  The Dag Hammarskjold Condo Board estimated that the apartment was worth $1.9-$2.05 million.  The estimate, far from speculative, was based on analysis of sales of comparable apartments in the building over a number of years.  Moreover, the Condo Board's estimate was in line with other estimates, including that of Nishan Kohli, who testified that he believed the apartment to be worth approximately $1.8 million.  Kohli based his estimate on the value of a similar apartment that he had sold.  Finally, the real estate market had appreciated significantly in the two years after the Kohlis first purchased the apartment for $1.24 million and subsequently spent approximately $165,000 improving it.  For example, the price of a three bedroom apartment in Manhattan rose roughly 23% in the first quarter of 2005 alone.  While data about the real estate market, without

_____

[8] It is unclear that the Board's failure to exercise its right of first refusal was related to the price of the unit.  Testimony from the Board revealed that the body did not exercise its right of first refusal in part because doing so would have required the Board to hold a special meeting, and they were unable to produce a quorum to convene such a meeting.

58

more, might have been insufficient to support the imposition of the 14 level enhancement, the totality of the evidence leaves no question that the apartment was worth *at least* $1.6 million and Bahel therefore benefitted by at least $400,000. We agree with the district court that the evidence established that the $1.6 million valuation was "very conservative."

The district court also rejected Bahel's argument that it should deduct from that amount, the $27,500 that Bahel spent on closing plus the $90,000 that the Kohlis realized by avoiding the payment of a real estate commission. In the first instance, the fact that the Kohlis avoided paying a commission strikes us as wholly irrelevant to determining the benefit Bahel received from the fraud. Further, even if we were to credit Bahel's calculation that the total estimated benefit should have subtracted his $27,500 payment, the subtraction of that value from the district court's estimation of Bahel's gains still leaves Bahel above the $400,000 threshold and therefore firmly places him within the ambit of Section 2C1.1(b)(2).

## VII. Restitution

The Mandatory Victims Restitution Act ("MVRA") requires a defendant to reimburse a victim for, inter alia, "necessary . . . other expenses incurred during the participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). Attorneys' fees are "other expenses" that are properly included within a restitution award. *See United States v. Amato*, 540 F.3d 153, 159-60 (2d Cir. 2008). "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e).

### A. Legal Fees

The district court in this case ordered Bahel to reimburse the U.N. for $846,067.03 worth

59

of legal fees incurred in bringing this case as well as the $86,098.36 in salary Bahel was paid while he was suspended following the indictment (total: $932,165.39). Bahel contends that the U.N.'s legal fees were not "necessary" for the purposes of Section 3663A(b)(4) because the U.N. retained a "major New York City law firm" to represent it in this matter when the U.N. "had in-house counsel at its disposal," which could have "provide[d] the same services at a much reduced fixed cost." Our decision in *Amato* forecloses this argument.

In *Amato*, the defendants' fraud caused their employer to retain outside lawyers and accountants to perform an internal investigation and to represent the employer in connection with the Government's investigation and prosecution of the defendants. *See* 540 F.3d at 159, 162. We affirmed the award to the employer of full restitution for the $3,088,466 expended on attorneys' fees and accounting costs. *Id.* at 163. As *Amato* intimates, nothing in our case law limits restitution to cost of in-house counsel. Moreover, the law firm represented the U.N. at times for 25-40% below its normal billing rates, and no one has contended (1) that the fees themselves were unreasonable, or (2) that any specific task undertaken by the law firm was unnecessary—aside from Bahel's general and conclusory contention that in-house counsel could have handled the investigation. Likewise, nothing in the record indicates that it is uncommon for an organization to retain outside counsel in connection with investigations into internal fraud. *See id.* at 159, 162.

Bahel also complains that the Government did not supply the supporting billing records until two days prior to the restitution hearing. The record reveals that this is true but that Bahel refused to consent to an adjournment in advance of the hearing. The record also reveals that when the district court offered Bahel an opportunity to request an adjournment during the

hearing, so that he could fully review the records before the district court made a determination, but Bahel again refused to take the adjournment. For these reasons and those stated above, we conclude that the district court committed no error in awarding the U.N. $846,067.03 in legal fees.

**B.      Salary**

Finally, Bahel claims for the first time on appeal that the district court erred in providing the U.N. restitution for the amount of his salary, because he opines his salary w as beyond the scope of the MVRA. Specifically, Bahel argues that 18 U.S.C. § 3663A(b)(1)(B)(i)(I) "requires a restitution order to include 'the value of the [victim's] property on the date of loss,'" and because "the U.N. does not claim that it suffered any specific pecuniary or financial loss resulting from the conduct of Mr. Bahel," it was incorrect for the district court to "speculate that the U.N. somehow 'lost' services by Mr. Bahel and divine a portion of salary to be refunded and represent it as 'property' lost to the U.N."

Ordinarily, we review a restitution award for abuse of discretion. *See United States v. Boccagna*, 450 F.3d 107, 113 (2d Cir. 2006). But where, as here, the issue was raised for the first time on appeal, we review only for plain error. *See United States v. Fiore*, 381 F.3d 89, 98 (2d Cir. 2004). Under plain error review, "an appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable dispute'; (3) the error 'affected the appellant's substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings'; and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Marcus*, 130 S. Ct. 2159, 2164 (2010)

61

(quoting *Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009)).

There is one central problem with Bahel's argument: it ignores the fact that the money the U.N. paid in the form of his salary was plainly "property" that belonged to the U.N., at least some of which the U.N. lost as a result of Bahel's offense, since the U.N. paid him for his honest services, which is what he failed to provide. There is no question that a portion of an individual's salary can be subject to forfeiture where, as here, an employer pays for honest services but receives something less. *See United States v. Crawley*, 533 F.3d 349, 359 (5th Cir. 2008) (salary and pension procured through fraud is "within the . . . statutory language" of Section 3663A(b)(1)); *United States v. Sapoznik*, 161 F.3d 1117, 1121 (7th Cir. 1998) ("We may assume that [the employer] would not have hired [the defendant] had it known of his intentions, and in that event it would not have paid him four years' salary . . . . [W]hat [the employer] lost . . . . [was] the difference in the value of the services that [the defendant] rendered . . . and the value of the services that an honest [employee] would have rendered.").

The amount eligible for forfeiture under Section 3663A, however, appears to be a question of first impression in this Circuit. In this context, some of our sister circuits have contemplated the issue and their conclusions inform our analysis. In *United States v. Crawley*, the Fifth Circuit affirmed a district court order awarding restitution to an employer in the amount of the salary and pension awarded to the employee in the year after his fraud. 533 F.3d at 359. *Crawley* involved voter fraud relating to the defendant's election as president of a local union. *Id.* at 351. The evidence at trial established that Crawley had falsified ballots in order to secure his election, and unrelated to the voter fraud, he had received a $20,000 kickback in connection with a union contract. *Id.* at 352. Crawley was charged with one count of mail fraud in violation

of 18 U.S.C. §§ 1341, 1346; one court of embezzlement of an official ballot in violation of 29

U.S.C. § 501(c); one count of embezzlement from a labor organization for the kickback, also in

violation of 29 U.S.C. § 501(c); and one count of making a false entry in records required by the

Labor Management Reporting and Disclosure Act, in violation of 29 U.S.C. § 439(c). 533 F.3d

at 352. He was convicted of all counts. *Id.* at 353.

Crawley argued on appeal, similar to what Bahel argues here, that his salary should not

have been forfeited because the loss to the union, his employer, could not have been related to

his salary and pension, because the union would have had to pay an honest president the same

amount. *Id.* at 358-59. Rejecting this argument, the Fifth Circuit explained that the salary

obtained as a result of the fraud fell within the plain language of MVRA Section

3663A(b)(1)(A), which requires a defendant "(1) in the case of an *offense* resulting in damage to

or *loss* or destruction *of property* of a victim of the offense [to] (A) *return the property* to the

owner of the property . . . ." *Id.* at 359 (quoting 18 U.S.C. § 3663A(b)(1)(A)) (emphasis in

original). The *Crawley* court further explained that: "A contrary holding would allow Crawley

to benefit from his fraudulent conduct, a result which runs afoul of the principles on which

restitution is based." *Id.*

We think the same principle applies here. However, we also note that there is one

distinguishing factor between the cases—namely, that Crawley obtained his position as union

president through fraud whereas the evidence at Bahel's trial established only that he engaged in

a significant pattern of honest services fraud, not that he obtained his position through fraud in

the first instance. The Seventh Circuit confronted a similar set of facts in *United States v.*

*Sapoznik*. *Sapoznik* involved a police chief who was convicted of violating the Racketeer

Influenced and Corrupt Organizations Act ("RICO") by taking bribes to protect illegal gambling in town bars and restaurants. 161 F.3d at 1118. Judge Posner, writing for the panel in *Sapoznik*, explained: "The proper amount of restitution is the amount wrongfully taken by the defendant." *Id.* at 1121. The court continue: "The government argues that Sapoznik obtained his salary from Northlake under the false pretense that he was honest. We may assume that Northlake would not have hired him had it known of his intentions, and in that event it would not have paid him four years' salary, let alone one year's." *Id.* However, the court, noting that Northlake would still have needed a police chief, then explained that Northlake was entitled to restitution in the amount of "the difference in the value of the services that Sapoznik rendered Northlake and the value of the services that an honest police chief would have rendered." *Id.*

The district court had not calculated the value of that difference but instead had entered an order requiring Sapoznik to pay back one year's salary, which as the court of appeals noted, comprised one-fourth of his total salary as police chief. *Id.* at 1121-22. The Seventh Circuit noted that this was "an arbitrary fraction," but despite that, the court upheld the award on the ground that "it rather generously credit[ed] Sapoznik with being worth to the employer three-fourths of his salary even though he was corrupt." *Id.* at 1122.

Here, as in *Sapoznik*, the district court did not attempt to calculate the difference between honest services and the services Bahel provided. Indeed, the district court explicitly noted that the record showed that "it would be unduly complex to try to delineate which part of the $876,000 [the amount Bahel earned in salary between 1999 and 2006, the period covered by the fraud] was paid for honest services and which part was paid for the dishonest services." As the district court explained, it settled on $86,098.36, because that was the amount of salary Bahel

64

received following his January 2006 suspension pending investigation into his fraud, and while Bahel was suspended, he "performed no services at all," a finding Bahel does not dispute. We think requiring Bahel to repay the amount of the salary he received while providing no services at all cannot be considered error on the part of the district court. This is especially true in light of the fact that Bahel was ordered to repay less than 10% of the total salary he received while working for the U.N.; that is, by implication, the district court estimated the outer calculable worth of Bahel's services to be 90% of his total salary. Insofar as the Seventh Circuit noted that ascribing 75% of an honest police chief's salary to Sapoznik's corrupt provision of services was a generous estimate of the value of his services, we likewise find that requiring Bahel to repay less than 10% of his total salary was a conservative estimate of the cost of the fraud with respect to his salary.

## CONCLUSION

We have considered Appellant's remaining arguments and find them to be without merit. For the reasons stated herein, we **AFFIRM** the judgment of conviction in its entirety.